Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

STATE OF MINNESOTA

COUNTY OF NOBLES

DISTRICT COURT

FIFTH JUDICIAL DISTRICT

CASE TYPE: Malpractice

-----------------------------------------------------------

Allan M. Schreier, individually, as beneficiary
and Co-Trustee of the John J. Schreier
Revocable Intervivos Trust and of the Ann
Barbara Schreier Revocable Intervivos Trust,
and as Co-Personal Representative of the
Ann Barbara Schreier Estate,

District Court File No: 53-CV-17-505

Plaintiff

v.

SECOND AMENDED COMPLAINT

Drealan Kvilhaug Hoefker & Co. P.A., and
Hedeen Hughes & Wetering,

Defendants.

-----------------------------------------------------------

Allan M. Schreier, individually, as beneficiary and as Co-Trustee of the John J.

Schreier Revocable Intervivos Trust and the Ann Barbara Schreier Revocable Intervivos

Trust, and as Co-Personal Representative of the Ann Barbara Schreier Estate, alleges

as follows for his Second Amended Complaint:

## PARTIES

1.      Plaintiff is an individual residing at 10944 Country Club Road, Belle

Fourche, South Dakota 57717. He is a beneficiary of the aforesaid trusts. He is also a

trustee of the aforesaid trusts, including any trusts created thereunder such as the

John J. Schreier Credit Trust and the John J. Schreier Marital Trust. He was also the

Co-Personal Representative of the Ann Barbara Schreier Estate.

2.      Drealan Kvilhaug Hoefker & Co., P.A. (hereinafter DKH) is a Minnesota

corporation formed under Minn. Stat. Chapter 302A with a registered office at 909

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

Fourth Avenue South, Worthington, Minnesota 56187. It is the long time accounting firm of John J. Schreier (JJS) and Ann Barbara Schreier (ABS).

3.      Hedeen Hughes & Wetering (hereinafter HHW) is a law firm with a principal place of business of 1206 Oxford Street, Worthington, Minnesota 56187. HHW is the assumed business name of William J. Wetering, Lawrence B. Hughes, Carla R M, and William T. Hedeen, according to the records of the Minnesota Secretary of State. It is the long time law firm of JJS and ABS.

4.      At all pertinent times hereto, DKH was the accounting firm for the aforesaid trusts, trustees and some of their beneficiaries. Plaintiff was a client of DKH as a co-trustee of said trusts and as the Co-Personal Representative of the Ann Barbara Schreier Estate. Plaintiff was also a known, intended and direct beneficiary of services rendered by DKH to other clients, including JJS, ABS, their trusts and estates.

5.      At all times pertinent hereto, HHW was the law firm for the aforesaid trusts, trustees and some of their beneficiaries. Plaintiff was a client of HHW as a co-trustee of said trusts and as the Co-Personal Representative of the Ann Barbara Schreier Estate. Plaintiff was also a known, intended and direct beneficiary of services rendered by HHW to other clients, including JJS, ABS, their trusts and estates.

## MALPRACTICE

6.      DKH and HHW owed duties of reasonable care to the aforesaid trusts, trustees and their beneficiaries, including Plaintiff.

7.      DKH and HHW also owed duties of reasonable care to Plaintiff as Co-Trustee of the aforesaid trusts and as the Co-Personal Representative of the Ann Barbara Schreier Estate.

2

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

8.    DKH and HHW also owed duties of reasonable care to Plaintiff as the known, intended and direct beneficiary of services rendered by DKH and HHW to other clients, including JJS, ABS, their trusts and estates.

9.    DKH and HHW breached said duties by failing to use reasonable care in rendering services to JJS, ABS, their trusts and estates, their trustees, their beneficiaries, and their personal representatives, including Plaintiff.

10.    Said breaches included but are not limited to failing to use the same degree of skill and learning that an accountant and a lawyer, respectively, would use who is in good standing, in a similar practice and in similar circumstances.

11.    Defendants' malpractice included but is not limited to the failure to claim the Minnesota Qualified Small Business and Farm Property Deduction (hereinafter referred to as the "Q deduction") on the 2012 Minnesota estate tax return of the Estate of John J. Schreier which was filed in 2013.

12.    Defendants' malpractice also included but is not limited to their failure to advise JJS, ABS, their trusts, their trustees, their beneficiaries, their estates and their personal representatives as to the steps they needed to take to carry out the estate planning that Defendants had created for them.

13.    Defendants' malpractice also included but is not limited to their failure to promptly inform Plaintiff of all relevant circumstances, to reasonably consult with Plaintiff about the means by which Plaintiff's objectives were to be accomplished, to keep Plaintiff reasonably informed about the status of the matter, to promptly comply with reasonable requests for information, to consult with Plaintiff regarding limitations on their conduct, and to abide by Plaintiff's decisions as to the objectives of their services.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

14.     Defendants negligently, and intentionally, kept Plaintiff in the dark about the aforesaid trusts and estates.

15.     As a direct and proximate result of the aforesaid malpractice, Defendants caused harm to the aforesaid trusts, trustees, beneficiaries, estates, and personal representatives, including Plaintiff.

16.     Said harm includes but is not limited to the aforesaid trusts initially receiving less property than they would have received had there been no such malpractice plus additional attorney's fees and accounting fees incurred to correct Defendants' errors.

17.     Said damage also includes the fees Defendants charged for such negligent services.

18.     Said damage also includes the attorney's fees and other expenses Plaintiff had to expend to find out what happened.

19.     Said damage also includes damages incurred from breaches by Carl Schreier ("Carl") of his duties as co-trustee of the aforesaid trusts and as co-Personal Representative of the estate of ABS.

20.     The exact amount of said damages is not presently known but is reasonably believed to exceed $50,000.

**RICO**

21.     Defendants violated the Racketeering Influenced Corrupt Organizations Act (RICO) (18 U.S.C.A. § 1961 – 1968).

22.     Defendants engaged in racketeering activity which is indictable under 18 U.S.C.A. § 1341 (mail fraud) and 18 U.S.C.A. § 1343 (wire fraud).

4

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

23.     Defendants used U.S. mail and emails to execute or attempt to execute a scheme or artifice to defraud and to obtain money by false pretenses, representations and promises.

24.     Defendants engaged in at least two or more acts of racketeering activity between 2012 and 2017.

25.     Defendants used income from said pattern of racketeering activity for interstate commerce purposes as defined in RICO.

26.     Defendants provided other than routine professional services to the racketeering enterprise between them and Carl.

27.     Defendants and Carl conspired to violate the above provisions of RICO.

**28.**     State courts have concurrent jurisdiction with federal courts for RICO cases.

## AIDING AND ABETTING

29.     Defendants aided and abetted Carl in breaches of his fiduciary duties as a co-trustee of the JJS Trust and the ABS Trust and as co-personal representative of the Estate of ABS.

30.     Carl's breaches of his fiduciary duties were torts which injured Plaintiff.

31.     Defendants knew that Carl was breaching his fiduciary duties.

32.     Defendants substantially assisted Carl in the achievement of said breaches.

## PARTICULAR FACTS

33.     JJS and ABS were married and had three children: Carl, Allan and Paul.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

34.    JJS and ABS owned approximately 700 acres of farm land in Murray County in southwestern Minnesota.

35.    On March 30, 1992, JJS and ABS signed several estate planning documents which had been drafted by HHW. These included the following:

a.    The John J. Schreier Revocable Intervivos Trust (JJSRIT).  JJS was the initial trustee but he could be removed if his children determined him to be unable to manage his affairs. (That did happen on July 5, 2011.) The trust provided that, upon the death of JJS, Carl, Allan and Paul would become the co-trustees. The trust further provided that ABS could request to also be a co-trustee but said request had to be made in writing and, until she did so, she was not a trustee.   (She never made such a request.) The trustees were given full power and authority over all tax matters affecting the trust. The trust provided that upon JJS's death (if ABS survived him which she did), the trust assets were to be divided by the trustees into two parts, the Credit Trust and the Marital Trust. The Credit Trust was to consist of assets equal to the largest taxable amount on which no federal estate tax was payable at the time of his death after applying the unified credit allowance (then $1 million). The remaining assets were to go to the Marital Trust. ABS was given a power of appointment over the assets in the Marital Trust but not over the assets in the Credit Trust. (She never exercised this power.) Upon her death, the assets in the trusts were to be divided into three equal shares for Carl, Allan and Paul per stirpes. The Credit Trust provided that the net income must be paid to ABS but the

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

trustees could withhold the same if they determined she had other adequate income. The Marital Trust required the net income to be paid to ABS.

b.   A will for JJS. The will provided that JJS's homestead would go to ABS if she survived him (which she did) and the rest of his assets would pour over into the JJSRIT (which they did).

c.   The Ann Barbara Schreier Intervivos Revocable Trust (ABSRIT). Its terms were similar to those of the JJSRIT.

d.   A will for ABS. It was similar to the will of JJS.

36.   On October 27, 2006, deeds were signed by JJS and ABS transferring an undivided one-half interest in the aforesaid land to JJS as trustee of the JJSRIT and the other undivided half to ABS as trustee of the ABSRIT. The deeds were drafted by HHW. The deeds were not recorded at that time but were held in the offices of HHW.

37.   On October 27, 2006, JJS signed an amendment to the JJSRIT which provided that the amount to be paid into the Credit Trust was to be equal to the largest taxable amount on which no federal or Minnesota estate tax was payable at the time of his death after applying the unified credit allowance (then $1 million). A similar amendment was made to the ABSRIT. These amendments were drafted by HHW.

38.   On May 13, 2010, HHW sent a letter to JJS and ABS stating in part that it was the trustees who were to decide which assets would go into the Marital Trust and the Credit Trust.

39.   On March 23, 2011, Bill Wetering of HHW sent a letter by U.S. mail to Carl stating that HHW understood JJS was no longer competent, enclosing a form for the

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

three children to exercise the above removal power, and stating that HHW was still holding the aforesaid deeds in their office.

40.     On June 3, 2011, HHW again wrote a letter to Carl which was sent by U.S. mail encouraging him to bring his mother to the office to sign an amendment to her trust.

41.     On July 5, 2011, Carl, Allan and Paul signed a document determining that JJS was not able to manage his affairs, removing him as trustee of the JJSRIT, and they became the three trustees thereof. HHW drafted this document.

42.     Amendments to the JJSRIT and the ABSRIT, which had been prepared by HHW, were signed by ABS and by the three adult children for JJS on July 11, 2011.

43.     On July 28, 2011, Paul suddenly died, leaving a widow (Michelle Schreier) and three minor children.

44.     On November 30, 2011, Carl wrote HHW asking HHW to create his own trust to receive assets from his parents' trusts unless this would "create new unintended problems."

45.     On February 7, 2012, HHW sent a document to Carl by U.S. mail to create a revocable trust for him as well as amendments to his parents' trusts to have his share of their assets go to his new trust when they would die.

46.     On or about February 10, 2012, ABS asked Cindy Penning of DKH if the rents ABS's and JJS's trusts were charging Carl and Michelle of $150 per acre were unfairly low. ABS said that her third son (Plaintiff) was concerned that Carl and Michelle were getting a good deal and he was being shorted, that she did not want to be unfair to her third son but she wanted to do right by her two sons (apparently meaning Carl and

8

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

Paul's widow Michelle) who were farming the land. ABS told Ms. Penning one section JJS owned was the highest soil value in Murray County. Ms. Penning sent some information to ABS about land rent and fair values. Ms. Penning testified in her deposition on May 8, 2018 that this information showed rent of $150 per acre was in the middle range.

47.   Had the land been offered to the public for rent in 2012, the approximate market rental range was between $300 and $330 per acre, according to an analysis thereof by a professional independent farm management company.

48.   Carl and Michelle were renting all 700 acres owned by JJS, ABS and/or their trusts.

49.   Carl and Michelle were paying $105,000 (300 – 150 = 150; 700 x 150 = 105,000) per year less than minimum market value, assuming they were actually paying the $150 per acre which they were not.

50.   At this time, Carl was a trustee of the JJSRIT.

51.   This unfairly low rent and failure to pay rent were breaches of his duties as a trustee which harmed said trust and its beneficiaries, including Plaintiff.

52.   On February 27, 2012, amendments to the JJSRIT and the ABSRIT were signed ABS and by Carl and Plaintiff on behalf of JJS. These amendments were drafted by HHW. The amendments provided that Carl's share of his parents' assets would go to his revocable trust rather than to him outright.

53.   On April 17, 2012, JJS died.

54.   At the time of his death, the aforesaid land consisted of agricultural land.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

55.   At the time of his death, the aforesaid land was owned by a person (JJS) or by an entity (JJSRIT), depending on the legal effect of HHW not recording, prior to JJS' death, the aforesaid deeds signed on October 27, 2006 by JJS and ABS.

56.   For the property taxes payable in 2012, the aforesaid land was classified as agricultural land (also known as Class 2a land) by Murray County.

57.   For the property taxes payable in 2012, said land was also classified as agricultural homestead by Murray County.

58.   Said land had been continuously owned by JJS for more than three years prior to his death, either by direct ownership or via the JJSRIT.

59.   Said land was classified for property tax purposes as Class 2a property for the three years following his death.

60.   The JJS estate and the JJSRIT were willing to maintain the aforesaid Class 2a classification for the three years following JJS's death and did so.

61.   At the time of his death, the present beneficiaries of the JJSRIT were all family members (spouse and lineal descendants) within the third degree of kindred according to the rules of civil law.

62.   Said beneficiaries were all natural persons.

63.   Said beneficiaries were also willing to maintain the Class 2a classification for the three years following JJS's death and did so.

64.   At least one of the aforesaid family members was actively operating said farm from the time of JJS's death to the current date.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

65.    At the time of his death, JJS's taxable estate was below the federal exemption amount of $5.12 million but was above the Minnesota exemption amount of $1 million.

66.    JJS's estate consisted of a one-half interest in the aforesaid 700 acres, which half was then worth $2,791,451, plus other assets worth $95,523, for a total of $2,886,974.

67.    The personal representative (PR) of the JJS estate was ABS.

68.    HHW represented the PR of the JJS estate.

69.    HHW also represented Carl and ABS as individuals.

70.    HHW also represented Carl and Plaintiff as trustees and as beneficiaries of the JJSRIT.

71.    According to HHW, HHW also represented "the members of the family" of JJS, which included Plainitff.

72.    HHW also represented the estate of JJS, according to HHW.

73.    On May 7, 2012, the aforesaid deeds were recorded by HHW with the Murray County Recorder.

74.    On a document bearing the date of June 27, 2012, Ms. Penning wrote notes indicating that she thought ABS was the sole trustee and that the land did not qualify for the Q deduction.

75.    Both of these statements were incorrect.

76.    DKH treated ABS as if she were the sole trustee of the JJSRIT; it ignored Plaintiff who was a co-trustee thereof.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

77.     On September 4, 2012, Mr. Wetering of HHW told Ms. Penning he had not seen trusts not work regarding the Q deduction (*sic*) and that the previous week he had taken the Q deduction in another person's estate, even though the land was in a trust before and after her death.

78.     On September 6, 2012, Mr. Wetering told Ms. Penning that he had talked with April Begordis, a CPA with the Minnesota Department of Revenue (DOR), who he said had told him that the land being in trust before death was not a problem regarding taking the Q deduction but that there was a problem if the land went into a trust upon death. Ms. Penning's notes of that conversation are unclear but appear to state that if the land went from JJS's trust to Carl's trust per the February 2012 trust that HHW had created for Carl, the Q deduction would not be available for JJS's estate. The last line of Ms. Penning's notes indicates that Mr. Wetering was saying that the JJS's estate could take the Q deduction.   Both Ms. Penning and Mr. Wetering said they could not remember much about this conversation in their depositions on May 8, 2018.

79.     The Q deduction was $4 million at that time.

80.     On September 11, 2012, HHW sent a letter by U.S. mail stating that it was "assisting the members of the John Schreier family."

81.     On November 21, 2012, HHW sent two letters by U.S. mail stating that it was "the attorney for the estate" of John J. Schreier.

82.     On December 21, 2012, Ms. Penning sent an email to Mr. Wetering stating that ABS had indicated to her that she did not want Plaintiff to sign JJS's estate tax return "due to his divorce."

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

83.    Ms. Penning and Mr. Wetering determined what land would go into the JJS Credit Trust and the JJS Marital Trust, which were subparts of the JJSRIT.

84.    This determination should have been made by the co-trustees Plaintiff and Carl.

85.    DKH and HHW did not consult with Plaintiff at that time regarding said allocation.

86.    The JJS estate tax return was due originally by January 7, 2013 (nine months from date of death). However, on January 15, 2013, Ms. Penning applied for an automatic additional six months extension, which made the return due by July 17, 2013.

87.    Ms. Penning testified in her deposition that she prepared said return in late December 2012, that she gave it to ABS in January 2013, and that it was filed in January 2013.

88.    ABS signed said return as PR of the estate of JJS.

89.    Said return was on Form M706.

90.    Said return did not take the Q deduction.

91.    The value of the aforesaid land was included in the federal adjusted taxable estate of JJS.

92.    Said return reported that $860,739 of JJS's half-interest in the farm land plus $5,430 in stocks were placed in the JJS Credit Trust and the rest of JJS's half-interest in the farm land ($1,930,712) plus the remaining miscellaneous assets ($90,093) were transferred into the JJS Marital Trust, for a total of $2,886,974.

93.    No Minnesota estate tax was due from the JJS estate because the assets in the  JJS Credit Trust were less than the Minnesota tax exemption amount of $1

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

million and the assets in the JJS Marital Trust were tax deductible from the JJS estate due to the marital deduction.

94.　　This allocation had the effect of giving ABS authority over more assets of JJS. Had the Q deduction been taken almost all of JJS' assets would have gone into the JJS Credit Trust (whose trustees were Plaintiff and Carl) and none to the JJS Marital Trust (of which ABS was the sole trustee).

95.　　Carl was able to influence ABS because she was dependent on him and because Defendants aided and abetted Carl. This enabled Carl, *inter alia*, to keep the rent unfairly low for himself and Michelle, to even avoid paying some of this unfairly low rent, and to otherwise benefit himself from the JJS trusts.

96.　　Neither DKH nor HHW told Plaintiff when the JJS estate tax return was filed, that the Q deduction had not been taken, or what the allocation of the assets in the JJSRIT was between the JJS Credit Trust and the JJS Marital Trust as shown on the tax return. Plaintiff should have been allowed to be involved in these matters.

97.　　These omissions and exclusions were intentional.

98.　　Defendants claim that ABS told them to not communicate with Plaintiff generally about trust matters. However, even if this is true, DKH and HHW should not have followed said instruction because ABS had no right to so instruct DKH and HHW because she was not a tustee of the JJSRIT, she never exercised her right to become a co-trustee thereof, and Plaintiff remained a co-trustee of the JJSRIT entitled to all information relating to the JJSRIT.

99.　　Defendants also incorrectly told Plaintiff that ABS had more voting power than Plaintiff regarding the JJSRIT; she actually had no vote. This incorrect advice

14

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

dissuaded Plaintiff from being more assertive and taking action earlier to correct Carl's breaches.

100.   On March 28, 2013, Ms. Penning wrote to HHW that ABS had asked her not to provide a copy of said return to Plaintiff. She further wrote that if ABS said it was OK, she would give a copy of it to him, but that he was not entitled to a copy of it even though he was a trustee of the JJSRIT. Plaintiff was in fact entitled to a copy of said return since it related to the JJSRIT.

101.   On April 15, 2013, Plaintiff sent an email to Ms. Penning stating that he was not approving the estate tax return for the JJS estate, not knowing that she had already filed it. He also told her to get an extension, not knowing she had already obtained one.

102.   DKH eventually sent a copy of said return to Plaintiff by U.S. mail without disclosing DKH could have and should have taken the Q deduction on it.

103.   Also later on April 15, 2013, Plaintiff told Ms. Penning by telephone that he should have been allowed to be involved in the division of the assets in the JJSRIT since he was a trustee thereof and ABS was not a trustee. He said he was just trying to do his job as trustee and that he was not satisfied with how the assets were allocated between the two trusts (JJS Credit Trust and JJS Marital Trust). Ms. Penning was upset by this conversation.

104.   DKH and HHW wrongly took directions and instructions from ABS regarding JJS trust matters, including but not limited to the facts stated in Plaintiff's timeline dated April 18, 2016 previously provided to Defendants, which timeline is

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

attached hereto as Exhibit 1 and hereby incorporated by reference as if fully set forth herein.

105.    Carl, DKH and HHW intentionally did not inform Plaintiff regarding trust matters.

106.    On April 17, 2013, the DOR accepted the return of the JJS estate.

107.    On February 17, 2014, ABS died.

108.    The PRs of her estate are Carl and Allan.

109.    Plaintiff believed HHW was the attorney for the JJS and ABS trusts and was looking out for the best interests of the beneficiaries.

110.    He frequently asked Mr. Wetering in that believed capacity to help him stop Carl from breaching his fiduciary duties, including but not limited to the unfairly low rent, the non-payment thereof, and the failure to share information with Plaintiff, including but not limited to banking information. These requests were made orally and in writing on many occasions, including but not limited to emails dated February 17, 2014 and February 24, 2014.

111.    Mr. Wetering did not attempt to clarify his role until April 6, 2014. Prior thereto, Plaintiff thought Mr. Wetering was the trust attorney who was a neutral party to help keep things fair to all the beneficiaries.

112.    On April 11, 2014, Plaintiff sent an email to Mr. Wetering stating that he continued to think Mr. Wetering represented the trust itself and that Mr. Wetering's role as trust attorney was to protect the beneficiaries but that he was retaining his own attorney.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

113.    Plaintiff also frequently asked Ms. Penning orally and in writing to help him stop Carl from breaching his fiduciary duties, including but not limited to the unfairly low rent, the non-payment thereof, and the failure to share information with Plaintiff, including but not limited to banking information and for DKH to share information with Plaintiff.

114.    DKH did not do so. Instead, DKH took the side of Carl, the breaching trustee, and told Carl he was doing a good job. One of the times this occurred was in an email from Ms. Penning to Carl dated June 3, 2014.

115.    Plaintiff thought he was a client of DKH in his capacities as co-trustee of the aforesaid trusts and as co-PR of the ABS estate. Plaintiff sent numerous emails to DKH. Some of these communications were adverse because DKH was not cooperating with him and was siding with Carl.

116.    Ms. Penning has stated that she had about 66 emails with Plaintiff between December 2013 and June 3, 2014. DKH certainly knew he was at least a direct and intended beneficiary of its services, if not a direct client.

117.    DKH and HHW turned against Plaintiff when he tried to stop Carl's breaches of his fiduciary duties. One example is on November 11, 2014 when Mr. Wetering wrote to Plaintiff's new attorney and made several false statements about Plaintiff. Ms. Penning joined in with HHW, saying "Well said Bill!"

118.    On October 21, 2014, an alternate appraisal authorized by HHW was done by Steve Prins on the aforesaid 700 acres of farm land, which appraisal cost $2,250.00. This was needless but ordered by HHW.

17

EXHIBIT H (re-filed)

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

119.    On February 6, 2015, Plaintiff's new attorney obtained a market analysis from a professional independent farm management company that determined the following approximate rental rates for this land per acre:

>    2012 - $300 to $330

>    2013 - $370 to $400

>    2014 - $370 to $400

>    2015 - $285 to $350.

120.    Carl and Michelle paid only $150 per acre during 2011, 2012, 2013 and 2014, when they did pay. Thus, using the minimum fair rent rates stated above, the rent was unfairly low by $105,000 in 2011, $105,000 in 2012, $154,000 in 2013, and $154,000 in 2014. Using the high end of the fair rent range, the rent was unfairly low by $126,000 in 2011, $126,000 in 2012, $175,000 in 2013 and $175,000 in 2014.

121.    On February 11, 2015, a Mediated Settlement Agreement was signed by Carl, Allan, Michelle, and an attorney for her three minor children (James Malters), with the assistance of Mr. Christopherson (a retired judge) as a mediator.

122.    The Mediated Settlement Agreement resulted in the partitioning of some of the aforesaid land among Michelle, Carl and Allan.

123. The Mediated Settlement Agreement stated, in part:

a.    Carl and Allan "shall continue to serve as co-trustees of John's Trust and Barb's Trust."

b.    "[A]ny unresolved matters arising under this Settlement Agreement, the accounting to be prepared for John's Trust and Barb's Trust, or the Estate

18

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

of Ann Barbara Schreier, as to law or facts, shall be submitted to binding

arbitration. The arbitrator shall be Bruce W. Christopherson ..."

c.     "Allan Schreier, his heirs, successors and assigns, hereby release and

forever discharge Defendants above-named, and their heirs successors

and assigns, from any and all claims said Releasors have against said

Releasees arising out of John's Trust, Barb's Trust and the Estate of Ann

Barbara Schreier, known or unknown. Defendants above-named, their

heirs, successors and assigns,   hereby release and forever discharge

Allan Schreier, his heirs, successors and assigns, from any and all claims

said Releasors may have against said Releasees arising out of John's

Trust, Barb's Trust and the Estate of Ann Barbara Schreier." ["Defendants

above-named' included Carl individually and as trustee of the Carl

Schreier Revocable Intervivos Trust.]

124.    The words "known or unknown" were erroneously including regarding

Plaintiff's release of Carl.

125.    Because DKH was still taking the side of Carl, Plaintiff's new attorney had

to send a letter to DKH on March 6, 2015 reminding them that Carl was not the sole

trustee and that Plaintiff was entitled to just as much information as Carl.

126.    On April 18, 2015, Carl and Allan agreed to submit to arbitration by Mr.

Christopherson certain unresolved issues regarding trust accounting and the allocation

of professional fees.

127.    On May 4, 2015, Mr. Christopherson issued his arbitration award.

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

128.   Said arbitration award stated that the awards were intended for trust accounting purposes only and did not determine the rights of law firms or others, said firms and others not being parties to the agreement to arbitrate.

129.   On May 7, 2015, federal and Minnesota estate tax returns were filed for the ABS estate.

130.   DKH signed said returns as preparer. Carl signed them as PR. Plaintiff was again largely ignored as he had been regarding the returns of the estate of JJS. Plaintiff complained about this to no avail.

131.   The total taxable estate of ABS was $5,043,430, which included the one-half of the aforesaid land which ABS received via the JJSRIT Marital Trust.

132.   No federal estate tax was due since the taxable estate was under the federal exemption amount.

133.   The Minnesota estate return for ABS's estate was filed on Form M706Q using the Q deduction.

134.   Use of the Q deduction of $3.8 million reduced ABS's Minnesota taxable estate to $1,243,430 with a tax due of $3,898.

135.   The ABS estate had earlier made an estimated Minnesota estate tax payment of $67,000.

136.   The ABS Minnesota estate tax return claimed a refund of $63,102 ($67,000 - $3,898).

137.   On June 30, 2015, the DOR requested more information about how ABS came into title to the half interest in the aforesaid land from JJS as indicated in the ABS estate tax returns.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

138.   On July 13, 2015, DKH sent a letter to the DOR in response to its request for more information.

139.   On July 22, 2015, the DOR replied, saying that it had determined that the half interest in the aforesaid land which ABS had acquired via the JJSRIT Marital Trust did not qualify for the Q deduction on ABS's estate tax return because ABS did not own said half interest for at least three years.

140.   The DOR therefore determined that the ABS estate owed $113,127.59, comprised of $93,345.00 in taxes, $18,669.00 of penalty, and $1,113.59 of interest.

141.   Per the recommendation of Quinlivan Hughes, P.A. (QH) and over the strong objections of Plaintiff, DKH and Carl challenged this determination. QH had been previously retained by Carl personally and as trustee.

142.   Substantial legal and accounting fees were incurred for this challenge.

143.   Even though DKH had been warned in writing on March 6, 2015 to share information with Plaintiff, DKH did not do so. One example is an email from Ms. Penning dated August 7, 2015 to Bradley Hanson at QH (who was now also assisting, and charging, the ABS trust with the DOR audit) saying "Just between us" addressing a concern about the legitimacy of the position being taken by DKH.

144.   Another example is an email she sent to Mr. Hanson (only) dated August 13, 2015 where she said she hoped the "hard words" email Mr. Hanson had sent to Plaintiff would make Plaintiff cave in to the erroneous position they were taking. She even asked if fees need to be incurred due to claimed such unreasonableness on the part of Plaintiff that he be considered incompetent.

21

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

145.   Another example of how DKH kept Plaintiff in the dark and intentionally misled him is the emails on August 13, 2015 between Ms. Penning and an attorney/accountant with QH by the name of Robert Cunningham. DKH was pressuring Plaintiff to support its position by challenging the DOR and saying it was running out of time to respond to the DOR. Mr. Cunningham wrote to Ms. Penning suggesting she "ask April Begordis for additional time to respond given your situation. She has given me additional time in the past." Ms. Penning shockingly replied "I know I have also previously, but I just didn't want to share that option with Alan so we can get him to agree, and pay the retainer."

146.   Meanwhile, Mr. Malters, the attorney for the three minor children of Paul, was threatening to sue Plaintiff and maybe Carl saying "You guys are on your own. If the trustees screw up I will sue them for the children." DKH was aware of this threat.

147.   On October 13, 2015, the DOR sent a letter rejecting the challenge just as Plaintiff had expected and the DOR maintained that ABS's estate could not claim the Q deduction on the half-interest ABS acquired from JJS.

148.   Plaintiff then had a lengthy exchange of emails with Ms. Penning about why the Q deduction wasn't taken in the first place on JJS's return. These emails are dated October 19 and 20, 2015. In these emails, Ms. Penning covered up her previous errors. She said the Q deduction was not available at the time JJS's return was filed but she intentionally failed to mention the fact that she had obtained an extension to file his return until July 7, 2013. She knew from past experience and general knowledge that the legislature often amends tax laws and that it typically adjourns in May. She falsely stated that "only after the law was changed two years later were the results capable of

EXHIBIT H (re-filed)

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

being achieved." She also failed to mention that revocable trusts are normally disregarded for tax purposes and that the law was unclear whether the Q deduction could be taken when a trust was involved.

149.   This cover up was believed by Carl and it had a further deleterious effect on the relationship between Plaintiff and Carl, resulting in more legal, accounting and other fees and expenses.

150.   On October 22, 2015, amended federal and Minnesota estate tax returns were prepared for the JJS estate claiming the Q deduction for his estate on the Minnesota return. This amendment increased the amount going into the JJSRIT Credit Trust from $866,169 ($860,739 + $5,430) to $2,886,974 with no assets going into the JJSRIT Marital Trust. Since his estate assets of $2,886,974 were less than the Q deduction of $3.8 million for qualified farm land and the Minnesota tax exemption amount of $1 million, no Minnesota estate tax would be due.

151.   At the same time, amended federal and Minnesota returns were prepared for the ABS estate as a result of the aforesaid amendment of the JJS estate tax returns. These amended returns for the ABS estate showed no assets going into the JJSRIT Marital Trust. These amended ABS estate returns also claimed the Q deduction for the half of the aforesaid 700 acres owned by ABS via the ABSRIT. No Minnesota estate tax was due since her estate assets were less than the then Q deduction of $3.8 million for qualified farm property and the Minnesota tax exemption amount of $1 million.

152.   However, these amended returns were not filed at that time because an issue regarding compliance with Minn. Stat. § 500.24 became apparent.

EXHIBIT H (re-filed)

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

153.   Apparently, HHW failed to inform JJS and ABS, their trusts and estates about Minn. Stats. § 500.24.

154.   On November 13, 2015, Plaintiff, addressing the aforesaid compliance issue, submitted applications to the Minnesota Commissioner of Agriculture on behalf of the JJSRIT and ASBRIT for family farm exemptions from Minn. Stat. § 500.24.

155.   On December 7, 2015, the Commissioner of the Minnesota Department of Agriculture certified that the JJSRIT and the ABSRIT complied with the statutory requirements relating to the acquisition of farm land under the family farm exemption pursuant to Minn. Stat. § 500.24.

156.   On December 21, 2015, the aforesaid amended returns for the JJS estate and for the ABS estate were filed.

157.   DKH continued with its cover up of its errors. For example, on January 12, 2016, Ms. Penning sent an email to Carl saying his father's estate tax return had been filed more than one month before the Q deduction law was "changed" to allow trusts to own farmland. The law was only clarified in this respect but more importantly, she failed to mention that she had until July 2013 to file the return after the law was "changed."

158.   Ms. Penning then continued to cover up her errors by attaching to said email an email from Ms. Begordis dated April 16, 2012 which said the tax form to take the Q deduction (M706Q) was not available as of that time and that Ms. Penning should file for an extension because the form would likely be available in May. Ms. Penning sent this email to Carl to convince him that she had done nothing wrong in not taking the Q deduction on the JJS estate tax returns. However, Ms. Penning again failed to mention that she had filed for an extension for JJS's estate return making it not due until

24

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

July 17, 2013 and that she could have, and should have, waited until at least after the legislature adjourned in May 2013 before filing it.

159.   On March 24 and 25, 2016, the DOR accepted all the amended returns and approved a refund of $67,000 to the ABS estate. This was due to the work of Plaintiff who had talked with Ms. Begordis to find out what needed to be done to take the Q deduction (amend JJS's return to take it on JJS's half and then also take it on ABS's half) and who talked with the Minnesota Department of Agriculture to get the exemption from Minn. Stat. § 500.24. DKH and QH had said this couldn't be done but Plaintiff did it.

160.   All of this caused extra time and expenses to be spent by Plaintiff for which he seeks reasonable compensation from Defendants. He should not have had to do this extra work as a trustee but Defendants' misconduct required him to do so.

161.   Plaintiff has given Defendants numerous explanations and spreadsheets detailing his claimed damages; one copy is attached hereto as Exhibit 2 which is hereby incorporated by reference as if fully stated herein.

162.   DKH continued with its cover up and misrepresentation. Another example is the email Ms. Penning sent to Plaintiff and Carl on April 26, 2013. She attached a copy of the May 20, 2013 law and said the original return was correct based on the law on January 30, 2013. But she neglected to mention that she could have, and should have, waited until the return was actually due after the legislature adjourned. She also neglected to mention that she could have taken the Q deduction, even before the law was clarified, because revocable trusts are normally disregarded for tax purposes. Plaintiff's expert affidavits provide more details about this allegation and are attached

53-CV-17-505

Filed in Fifth Judicial District Court
8/6/2018 3:03 PM
Nobles County, MN

hereto as Exhibits 3 and 4 and are hereby incorporated by reference as if fully set forth herein.

163.    Plaintiff has had to retain the undersigned attorney regarding this case and he is seeking recovery of his attorney's fees, costs and disbursements incurred as a result of this case, to the extent permitted by law including under RICO.

WHEREFORE, Plaintiff requests the following relief:

1.    Judgment against each of the Defendants in a reasonable amount in excess of $50,000, plus interest and costs as permitted by law.

2.    Threefold damages under RICO.

3.    Reasonable attorney's fees, costs and disbursements to the extent permitted by law including under RICO.

4.    Such other relief as is just.

DeWitt, Mackall, Crounse & Moore s.c.

Dated: _August 1_, 2018

By _Mark G. Ohnstad_
Mark G. Ohnstad (#81218)
Attorney for Plaintiff
2100 AT&T Tower
901 Marquette Ave.
Minneapolis, MN 55402
Telephone (612) 305-1416
Fax (612) 305-1414
Email: mgo@dewittmcm.com

## ACKNOWLEDGMENT REQUIRED BY LAW

The undersigned acknowledges that sanctions maybe imposed under Minn. Stat. § 549.211.

Dated: _August 1_, 2018

_Mark G. Ohnstad_
Mark G. Ohnstad

EXHIBIT H (re-filed)

John and Barbara Schreier Trusts
April 16, 2016

**Timeline**

1. March 30, 1992 - JJS and ABS Wills & Revocable Intervivos Trust Documents prepared by Hedeen & Hughes law firm. Each trust having one half undivided interest in S½ Section 4, T106N, R40W, S½ Section 5, T106N, R40W, and E ½ SW ¼ Section 33, T107N, R40W, Murray County, MN. Total of 720 acres.

2. March 15, 1995 - Amendment #1 to JJS and ABS Revocable Intervivos Trusts-Credit Trust value to be limited by the either the maximum of the Federal or Minnesota State Estate tax limitation.

3. August 12, 2003 - Deed of 10.65 acres to Paul Schreier from Section 4, T106N, R40W, Murray County, MN - For Paul Schreier home site

4. September 20, 2006 – Deed of 10 acres to Carl Schreier from E ½ SW ¼ Section 33, T107N, R40W, Murray County, MN – For Carl Schreier home site

5. October 27, 2006 - Deeds transferring land into the Revocable Intervivos JJS and ABS Trusts prepared by Hedeen & Hughes law firm. These deeds were not filed until after John Schreier's passing in 2012.

6. December 2009 - Vehicle keys taken from John Schreier because of advancing alzheimers

7. December 28, 2009 – Approximate date - met with all family members in office of Hedeen and Hughes to discuss John advancing dementia and estate planning. Allan, and likely Carl and Paul, first learned of existence of revocable intervivos trusts. John and Barbara seemed a bit unaware of the implications and processes contained in the trust documents.

8. January 3, 2010 – Approximate date - Allan accompanies Barbara to a meeting with accountant Cindy Penning to discuss current rents and the sufficiency of rents to provide adequate income to cover pending care costs of John and to provide adequate cash for John and Barbara estates to avoid having to sell land or borrow money to pay estate taxes. Land values rapidly increasing at this time due to high commodity prices. Carl and Paul were the farm tenents. Rent raised from 100$ per acre to 150$ per acre as a result of the meeting. Carl is not able to justify this in opinions given at the time. Paul was generally accepting of the rent increase. At the time, the basis (future capital gains implications) of land inherited was also of concern to Carl and Paul due to unknowns in the tax laws and potential elimination of stepping up the basis upon inheritance.

9. March 9, 2010 - John Schreier admitted to Maple lawn nursing Home, Fulda MN

10. August 3, 2010 - John Schreier discharged from Maple Lawn nursing home and admitted to the Meadows long term memory care unit in Worthington, MN.

11. August 2010 to July 2011 – John's ongoing dementia, alzheimers and subsequent care was subject of most of the family discussions throughout this time. On "Estate Planning" matters, Carl, Allan, and Paul were discussing rapidly rising land values, the basis issues of inherited land, and potential estate taxes. It is the recollection of Allan, some Federal estate tax breaks were set to expire after 2010 and there was uncertainty on the 2011 estate tax situation. Carl and Paul were most

EXHIBIT 1

concerned over the basis issue. Allan was more concerned that the estate would have enough cash in checking accounts to cover the estate taxes. There was limited discussion on interpretation of the trust documents and duties of the trustees. There was discussion of a fourth amendment, which would designate which parcels of land would be inherited by each heir, doing away with Carl, Allan, and Paul each having a one third interest in all the trust land. The division was - Carl 230 acres, - Allan 240 acres, - Paul 230 acres and irregardless to the valuation to some extent. Paul and Carl's home sites were on the family farm and were to receive the parcels of land adjoining each of their ten acre home sites. Carl and Paul had no desire to be involved in each other's farming business, and Allan felt the same way. Paul and Carl used to farm together, but the way Carl was, Paul had split from the practice of farming together 5 to 10 years prior. These discussions of trust matters were not frequent but consistent. The status remained somewhat unresolved because to the pending federal tax law changes. John's healthcare was a focus during this time.

12. January 1, 2011 – Barbara Schreier moves into Lindenwood Assisted Living Facility in Slayton, MN.

13. May 23, 2011 - MN legislative session concluded after adopting new rules in Section 291.03 and subsequent sections of the code, allowing for a 3.8 million dollar estate tax deduction for "qualified" small business and farm property in Minnesota. The effective date of the new law was August 1, 2011. Cindy Penning later references this as the "farm deduction" in providing estate tax sheltering in ongoing conversations.

14. June 1, 2011 – Sale of John and Barbara Schreier home in Currie, MN. Approximately $75,000 of the proceeds of this sale gifted to Carl, Allan, and Paul.

15. July 5, 2011 - Amendment #2 to JJS and ABS Revocable Intervivos Trusts-See the addition of the single paragraph following Part A.2.; and all of Part C for additional direction on what I believe is the allocation of the trusts for based on the "basis" or "stepping up of the basis" for the benefit of the heirs.

16. July 28, 2011 – Passing of Paul Schreier, brother to Allan and Carl.

17. August 1, 2011 – New rules in MN Statue 291, Section 3, and subsequent sections of the code, allowing for a 3.8 million dollar deduction on the value of the taxable estate of "qualified" small business and farm property in Minnesota (farm deduction) become effective for estates retroactive to estates with decedents dying after June 30, 2011.

18. August 23, 2011 – date of post by Attorney Maggie Green, indicating revocable trusts are qualified for the 3.8 million dollar farm deduction, and describing certain procedures needed to obtain this farm deduction. This link was found by Allan recently, April 18, 2016, in researching claims to contradict statements and justifications of actions by Cindy Penning.

19. August 2011 to February 2012 – Paul's passing was a terrible blow to the family. His widow, Michelle Schreier, was very withdrawn and uncommunicative, and this continues to this day. Michelle did not like Barbara and was somewhat open about it. Likewise, Michelle was distant to Carl, probably based on the past experiences she and Paul had with Carl when farming together. It was certain she didn't want Carl in her business as he was opinionated and difficult to work with. The first harvest after Paul's death, all the neighbors pitched in. The following spring, she had one of her closer friends help plant, not Carl.

At this time, Barbara was handling much of the affairs of the farm and John's health care. Her health and state of mind was not the best either. She had moved into the assisted living facility in January of 2011. It was quite an adjustment for her. During this time, John's memory was failing and there were quite a few discussions about his medical needs and about his care and treatment/management for alzheimers. Barbara frequently expressed worries about money as both she and John were in care units. She expressed that other neighbors and friends of hers were getting more in rents (275$ per acres) on their farm ground.   In the rounds of mediation in 2015 needed to force an accounting of the estate from Carl, Carl was found to be as much as $42,000 behind in paying rents at the time of Barbara's passing.

After Paul's passing, I tried to reach out to Carl to approach mom together to take some of the burden off mom and just let her enjoy her time at the assisted living facility, make new friends, get used to getting out, enjoying things, and deal with dad's care. Carl argued the terms of trusts with me and repeatedly referred financial issues to mom as that's what she wanted to do.

I did have some communication with Bill Wetering of Hedeen and Hughes, the trust attorney for John and Barbara. Basically I asked Bill Wetering for interpretations of the trustees roles and their duties to assist me in debates with Carl. Bill Wetering was informed of the lack of coordination with Allan on lease agreements for all farm lands, including John's trust, and the substantial underpayment of rents. Bill Wettering made statements of "Carl is self dealing" and "can't do that as a trustee". Bill Wetering was asked for advice on how to proceed to correct this, but he turned the discussions of taking any actions by deferring to Barbara as being John's spouse and "that's what Barbara wants".

There were some discussions with Cindy Penning on trustee's roles, but conversations were mostly on estate planning aspects. It's possible the new farm deduction law was brought to our attention by Cindy Penning in this time period.

20. February 27, 2012 Amendment #3 to JJS and ABS Revocable Intervivos Trusts-References to Carl Schreier Intervivos Trust and direction to divide interest to children (ABS and JJS grandchildren) of deceased children of JJS or ABS – related to the passing of Paul Schreier.

21. April 17, 2012 - John Schreier date of death.

22. May 7, 2012 – Deeds, dated October 27, 2006 (ref Item 5 above) transferring land to JJS and ABS Trusts filed.

23. May 2012 to April 2013 – There were definitely some more earnest conversations with Carl, and Cindy Penning concerning the estate planning and preparation of tax returns after dad's passing. Barbara continued to handle affairs with John's estate thru this time. I again tried to work with Carl to approach mom in exercising our roles as trustees of dad's estate but Carl repeatedly deferred this duty to mom. Many of these conversations with Carl including preparation of dad's estate tax return.

I had conversations with Cindy Penning concerning the new farm deduction in order to understand it. Cindy Penning discussed the forming of the credit trust and marital trusts and there might have been some discussion of the roles of the trustees. I reached out to Cindy Penning in the matters of

my father's trusts. It is my belief she didn't consider me as a trustee for John's trusts. At one point in a phone conversation, she referred to my mom being the trustee for my dad's affairs, but after dad passed, it was then mom and Carl. I corrected her in this conversation by asserting my role as a trustee. Cindy Penning conceded this point but was audibly frustrated or vexed by having to correct herself. Cindy Penning did not seek my approval or input on decisions regarding preparation of tax returns at this point, seemingly deferring matters to mom and Carl. It wasn't until after the mediation in May of 2015 that Cindy sought my approval as a joint trustee on estate and tax matters. At that point, she started providing forms 8879 for my signature and approval of tax return filings.

The preparation of John's estate tax return drug on. I did make some inquires of Cindy Penning of the required information and informed Carl I should be involved. Carl was not very communicative or cooperative in sharing duties or information. Carl again deferred matters to Barbara. A long overdue land appraisal was received in later December, 2012. On February 11, 2013, Barbara had a serious incident at Lindenwood Assisted Living facility, falling and getting a compound fracture just above her ankle. Since mom was having medical issues, I pressed Carl and or Cindy Penning on the preparation of the estate tax return for John's trusts. On or around April 3, 2013, I learned these documents were ready and needed to be filed by April 15, 2013, creating somewhat of an emergency. John's estate tax return was actually prepared and dated January 30, 2013. Later after mom's passing, I found that Cindy Penning actually gave Carl a copy of this return, and other returns, for me. Carl didn't provide them to me until March 24, 2014, when Carl and I were discussing the past difficulties of managing the trusts after mom's passing. At the March 24, 2014 meeting, Carl got these documents for me out of his desk drawer and sort of threw them on the table in huff. He also scrawled out some checking account balances after I pressed him for the balances of money in the various trust checking accounts.

Going back to about April 3, 2013, I asserted my duties as a trustee for John's trusts to Cindy Penning and received partial copies of John's estate tax return from Cindy Penning by emails from April 3 through April 7, 2013. I discussed these documents with Carl and stated I had no detailed financial information on which to base an approval as a trustee. I believe I gave some kind of conditional approval as it seemed to be an emergency to get these documents filed by April 15, 2013.

I often related to Cindy Penning, the communication problems Carl and I were having, that information was not being shared with me, and decisions were being made without my consultation or approval. This included the preparation of tax returns for the various John Schreier trusts. Another area of concern was the proper accounting of the cash balances in the John Schreier Credit and Marital Trust checking accounts. It was later found that Carl was writing checks from the JJS Credit Trust checking account without any approval of Allan as the co-trustee. The resulting action was that Barbara did not become compelled to manage her ABS Revocable Intervivos Trust to her required needs, instead, relying on the JJS Marital Trust checking account and unauthorized funds from the JJS Credit Trust checking account. At the same time, Carl was deferring his role as a trustee to Barbara, entering into favorable farm leases, enabling the unauthorized distribution of funds from the JJS Credit trust, and interfering with Allan's attempts to fulfill his duties of a trustee. I asked Cindy Penning to coordinate with me as a trustee as Carl was not. I believe Cindy Penning made statements to the effect that all she needed was one of the trustees to sign these documents, and with Carl being in the area and managing the trusts with mom, she was in communication with just Carl. It was also her statement it was not up to her to enforce or ensure that Carl was fulfilling his

EXHIBIT H (re-filed)

role as a trustee. I made it known this did not sit well with me and Cindy Penning and I have had a poor relationship since this time.

24. January 30, 2013 - Federal Form 706 and MN Form M706 Estate returns prepared for JJS Estate. It is believed these copies were provided to Carl and Barbara for review and approval at this time. It is believed copies were prepared for Allan but given to Carl to send to Allan. Allan did not receive these copies prepared for him until over a year later, March 24, 2014.

25. February 11, 2013 – Barbara Schreier has a serious incident at Lindenwood Assisted Living Facilty. She fell and got a compound fracture above her ankle. It later was believed she had fallen because of a mini-stroke that resolved itself. Barbara had arthritis to varying degrees in several places and was not particularly mobile. Barbara fought healing of the fracture, rehabilitation of the leg, and infection in her fracture until her passing a year later. Basically her fracture never healed due to her ongoing infections.

26. April 3, 2013 – Allan's first receipt of Federal Form 706 and MN Form M706 Estate documents from Cindy Penning upon Allan's request.

27. April 15, 2013 - Federal Form 706 and MN Form M706 Estate returns were filed for JJS Estate. Allan was under some duress as there was not ample time to get or review supporting information used in preparation of John's estate return. John's Federal estate tax return contained a marital deduction scheme to keep the taxable MN estate under one million. The 3.8 million dollar farm deduction was not utilized on John's 2012 MN estate tax return.

There were questions asked about the farm deduction. I don't recall ever being told John's trust was not qualified for the MN 3.8 million dollar deduction. It was more to the effect that using the marital deduction was the way it had to be to form the "credit" and "marital" trusts referenced in the JJS and ABR Revocable Intervivos Trust documents. In 2015, amended returns prepared and filed in response to issues raised in a MN DOR audit of the Barb Schreier Estate, removed the marital deduction from John's Federal estate tax return basically placing all of John's land in the "credit" trust, and the MN farm deduction was then used in the John's amended MN Estate tax return. This estate tax planning mechanism still complied with the terms of the intervivos trusts as the trust documents did require the credit trust to be fully funded first, up to the amount sheltered from estate taxes, and the balance, if any would then be placed in the marital trust.

28. May 2013 to December 2013 – Barbara continued to have health issues concerning her compound fracture and subsequent infections. In November of 2013 Barbara had a serious health set back and was sent to the ER. It was believe she might pass at this time as she was experiencing heart and lung congestion and other organ failures. Barbara recovered from this incident.

29. December 3, 2013 - In response to Barbara's recent health incident, Carl provided Allan with a Quit Claim deed to a lake property ($125,000 value) that Barbara owned outright and was not part of the trusts. The deed conveyed ownership of the lake property to Carl and Allan, with a life interest retained by Barbara Schreier. The transfer was made to help avoid probate if Barbara were to pass. Carl and Allan still own the lake property together but it is cause for other issues to be discussed later.

EXHIBIT H (re-filed)

30. December 3, 2013 – In response to Carl's action on the lake property, Allan also wanted to document and address the fact that Carl was in possession of an $80,000 line of line of credit loan from Barbara Schreier. This loan would be listed as an asset to the estate on Barbara's passing and result in the estate having to be probated. When the loan was discussed with Carl, he stated he intended to hide this loan from the IRS. As a trustee, I wasn't going to take that chance as the interest had been reported on the tax returns. I also consulted with Cindy Penning who agreed the loan should be documented and addressed to avoid probate. Based on ambiguities in Carl's other statements about whether this loan was to be paid back on mom's passing, and when, Allan had a promissory note assignment document prepared and sent to Carl, who eventually signed it. The promissory note required the $80,000 loan to be paid to the heirs, each receiving one third, plus interest, on Barbara's passing. Upon Barbara's passing, Allan requested Carl repay this loan. After it seemed it would be difficult to get Carl to repay this loan to the estate, and seeing that other difficulties would occur in the estate matters, Allan originated a lawsuit against Carl to repay this loan in June of 2015. Carl retained an attorney but the loan was repaid in settlement.

31. February 10, 2014 – Allan was notified by Carl's step children that Barb was failing and was to be taken to the ER. Carl was on a vacation in Mexico. Allan was with Barb when she admitted herself into the ER. She was confused and disorientated and her signature was very scrawled. Barbara's confusion and disorientation continued to get worse for several days. It was determined she was suffering from massive infection in her leg/fracture area. Barbara started to respond to intravenous antibiotics and seemed somewhat lucid on Friday February 14. Carl returned home from vacation on the February 13. Allan returned home on February 15, 2014.

32. February 17, 2014 – Barbara Schreier date of death

33. February 2014 to April 2014 – It is believed by Allan that Carl brought mom individual leases to sign for all the John and Barbara Schreier trust lands for the 2014 and 2015 crop years at the same advantageous rates to Carl and Michelle Schreier, either shortly before he went to Mexico vacation, or on his return. Mom's signature on these leases were also very scrawled, indicating she signed shortly before she entered the hospital, or after Carl returned from Mexico. Carl made no attempt to discuss the lease documents and rates with me as he had to fear I wouldn't accept such favorable rates in the near future with possible large expenses pending. Mom was in no position to do anything but sign what Carl told her to sign. With the funeral and dealing with final matters I wasn't concerned about the 2014 crop year leases at the time. The existence of 2014 and 2015 leases didn't come to light until December of 2014 after my lawsuit had been served on Carl and he then tried to enforce the 2015 crop year leases. The 2015 leases were later found to be "illegal" and void.

Carl and I somewhat amicably addressed the funeral, estate matters, getting an appraisal, paying bills. Carl did make some veiled threats at this time. One was that I had better do as he says on the estate, renting to at the same advantageous rates him in the future, or he wouldn't leave my children anything from his estate. Another threat came from Carl's belief that a family member had to actually farm the ground for three years after in order to keep the 3.8 million dollar MN farm deduction and if he didn't get to pay the rent he wanted he wouldn't farm the ground (my one third?). Fortunately, Carl's threat was negated by the fact that MN has changed the rules in 2013 so that the family member only had to keep ownership for three years.

34. April 20, 2014 – Easter Weekend – Carl was basically an ass over some raking of leaves at the lake property and said a lot of uncalled for things. This was Allan's last straw. Allan discussed Carl's actions with Michelle Schreier, who concurred, he often acts this way. Allan sought out legal advice from Stoneberg, Giles & Stroup on how to deal with Carl.

35. May 11, 2014 – Personal letters were sent to Carl Schreier and Michelle Schreier formally relating all past and ongoing problems with managing the estate matters and trusts. A private agreement on division of land, settlement of issues, prepared by Paul Stoneberg, was included. Carl then retained a lawyer, Michael Cable, in Marshall, MN. Carl refused to sign the private agreement and made no attempt to negotiate. Allan never received a reply from Michelle.

36. May 27, 2014 – Stoneberg Giles and Stroup was authorized to proceed in suit against Carl to compel proper accounting and management of the estate and trusts. This direction, fairly soon thereafter, included the actions to partition the land in the trusts.

37. May 30, 2014 – Suit initiated to compel Carl to repay his $80,000 loan to the heirs. Carl, or his attorney, was contacted prior to this suit by Stoneberg and Carl was not cooperative. However, around June 13, 2014, settlement and payment on the loan was made to each heir, one third loan principal, plus interest. In later accounting of the estate, it was found that Carl was behind in making interest payments to Barbara on the loan. Carl's attorney on this matter was also Michael Cable in Marshall, MN.

38. June 2014 to December 2014 – There was ongoing interaction between Cindy Penning, Carl, Allan, attorney Paul Stoneberg, with limited involvement by Bill Wettering, all working toward getting an accurate accounting of the trusts and the completion of the estate tax return. Stoneberg Giles and Stroup assigned the lawsuit to Greg Bucher. Allan routinely appraised them (Greg Bucher) of the deadlines in completing the partition action in a timely manner to allow for Allan to be control the rental process on his one third share of the farm. There were extended periods of inactivity by SGS and Allan routinely called to get updates and to press for more timely action. Allan also pressed SGS to take action to compel Carl to provide timely information.

39. December 23, 2014 – Suit against Carl Schreier formally served. Allan routinely commented and questioned SGS on why it was taking months to develop the lawsuit. Allan routinely appraised them (Greg Bucher) of the deadlines needed to complete the partition action in a timely manner to allow for Allan to be control the rental process on his one third share of the farm for the 2015 crop year.

40. December 2015 to February 2015 – After Carl was served, it is believe he retained Bradley Hanson of Quinlivan and Hughes, St. Cloud MN. Paul Stoneberg indicated they felt they had to name the minor children in the suit as they benefited from the self dealing and James Malters in Worthingon MN was retained by the children's mother, Michelle Schreier.

Sometime in December 2014, Paul Stoneberg has a heart attack. He survived, but his case load had to be reduced. I believe I met Kevin Stroup in late December of 2014 or January 2015 in a meeting at Stoneberg's office. I continued to be in contact with Greg Bucher primarily.

There was discussion with Stoneberg' firm of designating a third party trustee and having to go thru the mediation process. Ongoing and repeated attempts were made to gain information from Carl made in order to have an effective mediation session. Carl provided nothing and SGS was

ineffective in compelling him to do so.  Many documents being sought were actually brought to the mediation and seen for the first time by Allan and or Attorneys Greg Bucher and Kevin Stroup.

41. February 11, 2015 – Mediation settling suit for underpayment of rents and partition of land.  Allan was represented by Greg Bucher and Kevin Stroup.  The outcome of the February 11, 2015 mediation was the partitioning of the land and the underpayment of rents.  Carl and Michelle were compelled to compensate Allan for underpayment of rents.  Allan did agree to purchase some land to receive a full 160 acre parcel (quarter) and this payment was included in the settlement of the underpaid rents.

42. It was Allan's concern leading up to the mediation that SGS had not responded to Allan's frequent requests to appraise Allan of how to prepare or what to expect from the mediation.  The completion of the partition needed to be timely in order to allow Allan to lease his ground for the 2015 crop year.  However, there were no deadlines set in the February 11 mediation for the completion of the partitioning.  Carl continued to drag out the partitioning process and the rate at which the SGS fees accumulated increased significantly.  After Allan's experience with SGS, Allan proceeded on his own to settle the accounting of the estate and various related matters after the partitioning deeds were executed and filed.

    There were also deadlines pending for the preparation and filing of the Barbara Schreier Estate tax returns.

43. April 7, 2015 – approximate date of completion of deeds for land partition and filing deeds with County.  Allan proceeded to enter into leases to rent his land for $301 dollars per acre.

44. May 4, 2015 – Conclusion of mediation to provide an accounting of the estate.  The outcome was mixed, but Carl was compelled to pay his past due rents and associated interest.

45. May 7, 2015 – Federal Form 706 and MN Form M706 Estate returns prepared and filed for the ABS Estate.  The taxable estate was provided as $5,043,430.  The Federal return included the value of the land "received" from John Schreier by the marital deduction taken in 2012.  The MN Form 706 included the use of a 3.8 million dollar deduction on the value of the estate for "qualified farm property".  The balance of the estate to be taxed in the MN estate tax return was $1,243,430 and the MN tax due was $3,898.  An estimated tax payment of $67,000 had already been made, so a refund of $63,102 from the State of MN was requested.  For reference, the $67,000 estimated tax payment was determined based on the value of the estate on the date of Barbara's passing.  There is an "alternate" appraisal process for estates, whereby the value of the estate can be reappraised if land values drop in the six months after the decedent passed.  Since the alternate appraisal requires IRS approval, it was recommended by the accountant Cindy Penning to make the estimated tax payment of $67,000 based on the value of the estate on the date of Barbara's death to avoid the possibility of any penalty or interest if the alternate appraisal valuation was not approved.  Then, when the estate tax return is filed, the alternate appraisal valuation will be used and a refund would then be requested.

    There was quite a bit of uncertainty in the preparation and approval of the 2014 estate tax return of Barbara Schreier.  Basically it was expected for Allan to just show up and sign the document without being afforded the ability to check the source documents.  There were some discrepancies in the

EXHIBIT H (re-filed)

documents that Cindy Penning was unwilling to address.  Allan did sign a co trustee signature page with but provided a conditional approval.

46.  June 30, 2015 – MN DOR request for information regarding a deed for land received by Barbara Schreier from John Schreier as indicated in Barbara Schreier estate tax return, after the two deeds of October 27, 2006, (filed May 7, 2012).

47.  July 13, 2015 – Reply of Cindy Penning to MN DOR stating that:

a.) The last deeds filed were the deeds of October 27, 2006, filed May 7, 2012, each transferring a one half interest in all lands to the JJS and ABS Revocable Intervivos trusts.
b.) Described how all of the JJS Trust land (values) was accounted for in the JJS estate tax return and what land was transferred to Barbara Schreier as the surviving spouse, referring to Schedules G and M;
c.) Described how the 50% interest of certain parcels of JJS Trust land were accounted for and these were then accounted for in the 100% interests of the ABS Trust tax return (Schedule G).  Stated, "Because the land was titled into John's Revocable Intervivos Trust before his death, no deed was prepared to transfer it into Barbara's name after his death.  It was left titled in John's original trust, and the income was reported as part of his Marital Trust after death, with a **distribution** to Barbara to include it on her Form 1040".
d.) Described how similarly, land was placed in the JJS Credit Trust, with income reported on the JJS Credit Trust tax return and paid to Barbara Schreier as a **distribution**.

48.  July 22, 2015 – MN DOR reply and determination that $113,127.59 was owed comprised of $93,345 in taxes, $18,669.00 of penalty, and $1,113.59 of interest.  Among other facts, the MN DOR found that the reporting of interests of Johns Schreier on the Federal Estate tax return, Schedule M, as a marital deduction to Barbara Schreier, constituted a transfer of property.  Since Barbara Schreier did not outlive John Schreier by three years, this transfer did not comply with the MN Farm deduction requirement to own land for three years prior to the decedents' passing.  The portion of John Schreier's interest in trust land (2 million in valuation) claimed on Barbara Schreier's estate return for the farm deduction were then disallowed and the requested total of $113,127.59 in tax, penalty and interest was then due.

49.  After this letter was received, there were numerous emails between Cindy Penning, Bradley Hanson, Carl Schreier and Allan Schreier discussing how to proceed to challenge this MN DOR determination. Allan's main concern was not proceeding until it was clarified who was going to pay $113,127.59 if the challenge to the MN DOR was not successful and who was going to pay the associated legal and accounting fees.  There was no resolution of this concern.  There was deadline to respond, or pay the MN DOR.  There was quite a bit of pressure exerted by Brad Hanson and Cindy Penning to pay the amounts due to the state of MN and resolve the matter later.  Allan refused this idea entirely. Carl was willing to comply with Hanson's advice.   To address the pressure to settle, Allan contacted the MN DOR, asked for a time extension and this was granted.

50.  August 20, 2015 – Allan receives approval from MN DOR for an extension.

51.  After the extension was received, Allan made a second brief phone call to the MN DOR auditor, April Begordis.  This was in response to generally not getting a straight-forward answer as to the nature of the MN DOR issue and un-cooperative replies from Carl and Brad Hanson as to who would

be liable for the taxes, penalties, interest, and associated legal and accounting fees if any challenge was unsuccessful. It was my intention as a trustee that the trusts be held harmless from any monetary damages resulting from failure to receive the tax sheltering possible on the John Schreier estate and the professional services provided to date by the firm's of Cindy Penning, Hedeen and Hughes at the time of John's Schreier passing. I also included those provided by Hanson's firm in the finalization of the ABS Estate if warranted.

52. Upon Allan's second call to April Begordis, and reviewing MN statutes of 2011, 2013 and thereafter, it became Allan's strong opinion that Cindy Penning made a tactical error in the preparation and filing of the JJS Estate tax return in 2012. In the second phone call, it was the statement of April Begordis that the marital deduction on the 2012 JJS Federal estate tax return was the basis for the MN DOR's position that a transfer to Barbara Schreier had occurred and until a different (amended) tax return was provided, that was going to remains the MN DOR's position. This was despite the fact that no deed had been filed to affect this transfer.

Cindy Penning was not willing to accept any responsibility for the outcome of the audit. Cindy Penning has repeatedly stated that the fact that farm trusts were not allowed to own land and then be qualified for the 3.8 million dollar MN tax deduction at the time of John's passing is why she used the marital deduction on the JJS Estate and not the farm deduction. Cindy Penning has also stated that changes to the MN tax laws in 2013 then allowed the trusts to own land and claim the farm deduction for the Barbara Schreier estate tax return.

Allan strongly believes these statements to not be accurate. At the time of dad's passing in 2012, Cindy repeatedly stated that we would be using the marital deduction on Dad's return and the farm deduction on mom's return. The trusts for Barbara were identical to John's at the time, so if Barbara's were qualified in the future, then John's certainly had to qualify in 2012. What is more accurate of the tax law "changes" is that the 2011 MN Statute 291.03 didn't specifically exclude trusts from owning land and being qualified for the 3.8 million dollar deduction. In 2013, language was added to 291.03 that specifically included trusts as being qualified for the 3.8 million dollar deduction. Allan also found that the MN tax instructions and forms for the preparing a 2012 tax return specifically allow family trusts to own land and use the 3.8 million deduction.

It's the position of Allan that had Cindy Penning followed the 2012 tax instructions as provided by the MN DOR, she would have claimed John's entire 50% interest in the land on the 2012 estate return utilizing the 3.8 million dollar qualified farm deduction to provide the desired "generation skipping tax benefits" (avoiding estate taxes). The original "credit" trust designated by Cindy Penning in the 2012 Federal return had a value of $866,169 in land and the amended 2015 Federal return "credit" trust had a value of $2,793,927 in land.

In looking ahead, part of the discussions on exercising roles as a trustee include discussion that Barbara had control over her interest, plus a substantial portion of John's interest via the "marital" trust, in setting rents and administering John's trust. It was stated by SGS attorneys that Allan could only really exercise authority over the JJS credit and that being small compared to the balance of the trusts control by Barbara, there wasn't much that could be done that would have changed the financial outcome. Following the proper course of action would have created a much larger "credit" trust and no "marital" trust, resulting in Allan having co-trustee authority over the entire JJS Revocable Trust land which then could have substantially affected the financial outcome.

EXHIBIT H (re-filed)

53. After Allan's second call to April Begordis, he informed Carl, Cindy Penning, and Brad Hanson of his facts and opinions that an error had been made in 2012 on the JJS Estate returns. Brad Hanson raised concerns that Allan's calls would lead to worse outcomes. Brad Hanson wanted to challenge the MN DOR position and prepare arguments for Cindy Penning to submit the returns as submitted should provide the desired tax sheltering. Allan disagreed with this action. At the time, it was also thought that it would also be possible to amend the 2012 JJS estate tax return to reflect using the full 3.8 million dollar farm deduction and that nothing was given to Barbara in 2012 by a marital deduction. It was Allan's intention that this was the right course of action to pursue and that more research and calls into this option would be the most prudent. Carl would not concede to this and deferred to Hanson's advice. Eventually Allan agreed to step back from the process, with the caveat that Carl, Hanson, and Penning were proceeding at their own risk related to additional legal and accounting fees.

Hanson prepared language for Cindy Pennig and a challenge letter was submitted. The MN DOR rejected the challenge. At that time, Allan informed Carl, Hanson, and Penning that they had been allowed to proceed at their own risk, that process had failed, and that I would engage another accountant to prepare the amended returns if Carl, Hanson, or Penning would not comply. Cindy Penning complied and prepared the amended returns.

54. October 13, 2015 – Letter from MN DOR rejecting challenge prepared by Hanson and Penning.

54. At this point, another attorney in Hanson's firm made reference to the corporate farm requirements in MN statue 500.24. The trusts had to comply with MN 500.24 in order to qualify for the 3.8 million dollar farm deduction. One of the requirements was to have filed a corporate report with the MN Dept. of Ag and this filing had not been done. Up to this point, Cindy Penning believed the trusts complied with MN 500.24, having prepared mom's initial estate return on May 7, 2015, and even the amended returns dated October 22, 2015 indicating the trusts had complied with MN 500.24.

After it was found the reports had not been filed for either the JJS or ABS trusts, Cindy Penning indicated she could not file the amended returns. There was a perceived dilemma as the trusts had been formed in 2012 upon dad's passing and the reports had not been filed for 2012 through 2014, and now the land in all the trusts had also been partitioned at this point, making filing retroactive reports impossible.

Hanson related there was a possibility that the MN legislature might be considering passing a law in the coming 2017 legislative session dealing with the issue of these estate planning trusts not having filed as required by MN 500.24, as apparently this was a widespread issue. Allan informed Carl and Hanson that it was not acceptable to wait a year for something that "might" and not hold someone accountable for the lack of not receiving a $67,000 tax refund, plus all the legal and accounting cost associated.

Allan proceeded to research the issue with MN 500.24 and found there is an exemption process, specifically eliminating the need for estate planning trusts to file with the Dept. of Ag under MN 500.24. The MN Department of Ag recognized the use of farm trusts for tax planning purposes and provided the exemption mechanism whereby trusts were completely exempt from the corporate farm ownership restrictions contained in MN Statute 500.24. In a sense, trusts for estate planning purposes are exempt from complying with any part of MN 500.24, upon applying for and receiving the exemption.

Hanson was unwilling give his approval of using this exemption process to Carl, deferring to the potential law change a year from that point. Allan proceeded to file for the MN Dept. of Ag exemption for both the JJS and ABS trusts. This process was successful and the exemption certificate was received dated December 7, 2015.

56. December 7, 2015 – Allan receives the exemptions for the JJS and ABS Revocable Intervivos trusts. The exemptions required some additional information to receive approval, coordinated by Allan. After the exemptions from the MN Dept. of Ag were received, the amended returns for the JJS and ABS trusts were filed. Both amended returns include revising the Federal tax returns to eliminate the 2012 marital deduction by John so that there was no appearance of a transfer to the MN DOR. Both amended returns utilized the MN farm deduction on the full value (each 50% interest in the land) of the JJS and ABS trusts.

57. March 24 & 25, 2016 – MN DOR accepts the amended returns and approves a refund of $67,000 to the ABS estate. The refund has been received and deposited, concluding the audit process.

EXHIBIT H (re-filed)

**Duties and Deviations there from.**

It is proposed there are two parts to the issue; one as to whether or not the standard of care was provided to ensure the proper execution and administration of the JJS Trusts, and two as to whether or not an error was made in the tax sheltering plan of trusts and preparation and filing of tax returns.

Part A.   Standard of care provided to the JJS and ABS trusts as a whole in execution and administration.

1. Bill Wetering prepared and filed the deeds placing the farm land into the ABS and JJS trusts in 2012. The reporting requirements of MN 500.24 were not complied with at the time.  The reporting requirements of MN 500.24 for trusts have been in place since 2000.  It would be the expected standard of care for Bill Wetering, a legal professional practicing in estate planning, to have prepared and filed the necessary corporate filings, or advised the trustees, thereof, for such long since established filing and reporting requirements.

2. Bill Wetering deferred his interpretation of the tax laws at the time (2012) to the advice of Cindy Penning.  This is a failure in providing the standard of care by deferring the requested provision of services to others, with the expectation of payment for such services and placing uncertainty in the responsibility for any consequences of estate planning process.

3. Bill Wetering and Cindy Penning both deferred to Barbara Schreier as a trustee of the John Schreier Revocable Intervivos trust.  In order for Barbara to exercise this role, a formal written notice was required and this written notice was never given.  Allowing this to occur resulted in the interference in the duties of Allan Schreier as a trustee in the improper execution and administration of the JJS Trusts.  The standard of care was not provided in ensuring the proper execution and administration of the JJS trusts.

4. Upon notice from Allan, Bill Wetering and Cindy Penning both were both aware of the conflict in interest of Carl acting as a trustee and being engaged in negotiating, preparing and signing leases as a farm tenant at rates well below the fair market value.  Bill Wetering did not provide the standard of care in protecting the interests of the JJS trust by failing to take actions requested by Allan as a trustee to enforce the terms of the JJS trust in the provision of trust income for the benefit of Barbara and subsequent heirs.

5. Upon notice from Allan, Bill Wetering and Cindy Penning both were both aware of the failure of Carl to seek agreement from Allan on the administration of the JJS trust and allowed Carl to act as a sole trustee.  Bill Wetering deferred taking action by continuing to allow Barbara Schreier to act as an unauthorized trustee of the JJS Trust.  Cindy Penning allowed the providing of financial information, preparing and filing tax returns, and accepting approval thereof, from Carl acting as the sole trustee for the JJS trusts, even after given specific notice this was not acceptable by Allan Schreier.  It is the standard of care for the estate's attorney and accountant to protect the interests of the JJS trust for the benefit of the heirs, independent of the interests of Barbara Schreier, or Carl Schreier, by requiring that all decisions and action are approved of by all trustees.  It is also the standard of care of the estate's attorney and accountant to protect the interests of all the trustees from improper or unauthorized actions by another trustee or non trustee.

EXHIBIT H (re-filed)

6.  Upon notice from Allan, Cindy Penning was aware that funds were being received and distributed from the JJS Credit trusts without proper controls. (Carl and or Barbara deposited money, wrote checks from the JJS Credit trust checking account), and did not take requested action by Allan as a trustee to make proper accounting of the JJS credit trust. It is the standard of care of the estate's accountant to ensure the reasonable controls are being utilized in the proper funding and administration of the JJS trusts.

Part B.  Standard of care of provided to the ABS and JJS trusts in following the correct procedures in tax sheltering of the JJS and ABS trusts.

1.  Cindy Penning prepared the estate returns of John Schreier upon his passing. It was the specific intent of the JJS Revocable Intervivos Trust that the maximum amount of John's estate be tax sheltered by the formation of a "Credit Trust", with the balance going to a Marital Trust. It was the duty of Cindy Penning, and or Bill Wettering, to provide the maximized tax sheltering plan for the estate. Cindy Penning, and or Bill Wetering, failed to utilize the MN 3.8 million dollar farm deduction on the full value of the JJS Revocable Irrevocable trust as allowed by the MN statues and tax regulations, or a reasonable interpretation of the intent thereof, at the time of John's passing in 2012. It was the expected standard of care that Cindy Penning and or Bill Wetering, practicing in estate planning and tax preparation would be fully aware of the MN Statutes, make a reasonable interpretation thereof, and appraise all trustees, or take adequate measures to do so (written and shared) of any questions, grey area, or the need for trustee's input and decision.

**Specifically**, points of lack of providing the standard of care are;

According to MN 500.24, estate planning trusts (trusts) were allowed to own land in 2012 when John passed away. It is believed, Cindy Penning, like Bill Wetering, was unaware of the requirements of MN 500.24, even in 2015 when the first filing of the ABS trust was prepared and filed, May 5, 2015. Cindy Penning indicted the ABS trust was in compliance with MN 500.24, even though it wasn't, as discovered by Quinlivan and Hughes thereafter.

In 2011 MN Statute 291 did not prohibit trusts from owning land and qualifying for the 3.8 million dollar deduction. In 2013, language was added to clarify that the intent of the law did allow for trusts to own land. The 2013 statute became effective August 1, 2013. There was nothing retroactive concerning the ability of trusts to own land prior to 2013 and still be qualified for the 3.8 million dollar deduction.

In 2011 and 2012, and henceforth, the MN state tax forms and instructions allowed trusts to qualify for the 3.8 million farm deduction. Hence it was the reasonable interpretation of the MN DOR to allow trusts to qualify for the farm deduction.

Cindy Penning prepared the JJS Federal estate tax return using a marital deduction scheme and limited the tax sheltering on the JJS trust to under 1 million dollars. The JJS Estate tax return was filed on or around April 15, 2013.

Cindy Penning has made statements trusts were not allowed to own land in 2012 when John passed away

The JJS Estate return was filed on or around April 15, 2013, prior to any changes in the 2013 statutes. Yet, it was then Cindy Penning's stated intention to use the MN 3.8 million dollar farm deduction on the full value of the ABS Estate return. The JJS Trust and ABS Trusts were identical and if it was interpreted possible by Cindy Penning to use the farm deduction in the future, it is reasonable to assume that the farm deduction was allowable on the JJS Estate return in the present.

It is reasonable to assume that Cindy Penning had been using the marital deduction, limited to one million dollars on MN taxable estates, for many years prior to 2011 when the farm deduction became possible. The farm deduction was new in 2011 and may have required additional effort to get interpretations but John passed away in 2012 and the return was not prepared or filed until 2013, well more than a year after the farm deduction law became effective and available for use. Even the 2011 and 2012 tax forms and instructions specifically provided for trusts to own land and qualify for the farm deduction. Admittedly the statutes weren't as clear until 2013.

If Cindy Penning had any doubts or concerns on the interpretations of new tax laws, and possible issues, she failed to make the trustees aware of them.

**Proximate Causes.**

Part A. Standard of care provided to the JJS and ABS trusts as a whole in execution and administration.

1.  There was a repeated and constant pattern of allowing Barbara Schreier to act as an unauthorized trustee by Bill Wetering, Cindy Penning and Carl Schreier. It is purported that Bill Wetering and Cindy Penning wanted to remain in favor with Barbara and to do so, were not willing to tell Barbara she was not acting properly. Barbara's husband's health was failing, she had lost a son, moved into assisted living, and her own health was failing. It was going to be a difficult thing to say, but as the professionals retained by the estate it was within the standard of care to provide this advice and take action. Other professionals, (doctors) don't just tell you what you want to hear, it's their duty to give the best advice, regardless of how difficult it is to hear or bear.
2.  Carl likewise relied on the deferring of trustee duties to remain favorable with mom and leave things as status quo in order to continue receiving very favorable leases on the farm ground, well below the market rates at the time. Carl has even provided emails indicating he sought advice from Michelle Schreier, the other farm tenant, as to how they wanted to go about setting lease rates, irrespective of the fact Michelle is not a trustee. He was attempting to remain favorable with Michelle as farm tenants. The decision on lease rates required Allan's input and approval, not Michelle's.
3.  Allan spoke with Barbara and Carl about the improper administration and operation of the JJS trust. Allan was deferred to speak with Carl by Barbara and when Carl was approached by Allan, the issues were deferred to mom. Both Carl and Barbara acknowledged to Allan that these kinds of family difference lead to lawsuits in family estate matters. Allan repeatedly made these occurrences known to Bill Wetering and Cindy Penning. Allan asked that appropriate actions be taken by the professionals associated with administering the trusts. It wasn't until all hopes were lost did Allan then seek other legal advice from Stoneberg Giles and Stroup. A private agreement to settle differences was even offered to Carl and Michelle, but this offer to settle was rejected in full by Carl and Michelle.
4.  Cindy Penning used a "marital" deduction on the JJS Federal Estate and MN tax returns, rather than a farm deduction. This gave the perception that Barbara Schreier had control over a much larger interest of the total estate, minimizing or negating the need to involve Allan as trustee of the JJS

EXHIBIT H (re-filed)

Credit Trust. Had the full value of John's interest been vested in the Credit Trust, as later found to be required, the proper execution and administration of the Credit Trust would have had a much larger significance in ensuing actions.

5. There was a written and executable trust document for the JJS trust to be followed and that document was not followed or enforced by the professionals, even upon Allan's request as a trustee. Bill Wetering and Cindy Penning willingly and knowingly did not take the appropriate actions to curtail Barbara in performing the duties of a trustee and to also curtail Carl from abdicating his trustee duties to Barbara when it served his own interests. It is the opinion of Allan, had Bill Wetering and or Cindy Penning taken appropriate actions as professionals associated with the trust and followed expected normal procedures that would have required that Allan carryout and fulfill his duties as a trustee, the proper administration of the trusts would have occurred. The financial outcomes of the estate might have changed substantially, even though admittedly Barbara would still have had a substantial financial influence having full control of her 50% interest in the total estate. Barbara could have given her written notice electing to be a trustee of the John Schreier Trust. In counter, Allan could have restored a balance of control by having Carl removed as a trustee due to the conflict of interest of being a farm tenant and participating in self dealing actions. Regardless, the financial outcome of the estate was subsequently mediated on February 11, 2015 and May 4, 2015.

6. However, it is also the opinion of Allan had Bill Wetering and or Cindy Penning taken appropriate action as professionals associated with the trust that a lawsuit initiated by Allan to assert his responsibilities as a trustee, including approval of farm leases, approval of distributions from the trust, proper accounting to trust funds, and preparation and approval of tax and legal documents, a lawsuit initiated by Allan would have been avoided.

Part B.  Standard of care of provided to the ABS and JJS trusts in following the correct procedures in tax sheltering of the JJS and ABS trusts.

1. In 2011, the state of Minnesota enacted new tax rules related to "qualified small business and farm property" to provide a deduction of 3.8 million dollars on the value of the estate subject to MN Estate taxes. Prior to this new law, the deduction was one million dollars. The new laws applied to decedents dying after June 30, 2011.

2. On the John Schreier 2012 Estate tax returns, Cindy Penning used a marital deduction on the original 2012 Federal Estate return of John Schreier to reduce the taxable value on the MN estate tax return to under one million dollars. The marital deduction was used to pass on the balance of the estate to Barbara Schreier for future tax sheltering.

3. After Barbara passed, Cindy Penning used the MN farm deduction to reduce the value Barbara's estate, including the value of the marital deduction received from John in 2012, by the 3.8 million dollar deduction. MN DOR conducted a standard audit of Barbara's return. The MN DOR determined the marital deduction of John's was in essence, a transfer of land from John Schreier to Barbara Schreier. The MN DOR also determined that since it was required for Barbara to own all land claimed in the MN farm deduction to be owned for three years prior to her death, the value of the land received from John by the marital deduction was taxable as Barbara did not outlive John by the three years.

4. After the estate expended considerable time and legal and accounting fees in challenging the MN DOR's determination that the original returns as filed for John and Barbara still qualified for the farm deduction, the MN DOR did not change its position. In total, $113,127.59 in taxes, penalties, and interest were found to be due. Upon further actions by Allan Schreier, the 2012 and 2014 estate tax returns were amended, whereby the marital deduction used on John's return was eliminated and

the farm deduction was then used on both John and Barbara's estate tax returns, each reflecting the full value of their respective Revocable Intervivos Trusts (both each being under 3.8 million dollar limitation). The amended returns were accepted and a refund of $67,000 on the Barbara Schreier return was finally received.

5. It is the opinion of Allan that had Cindy Penning not used the "marital deduction" as a tax sheltering mechanism on John's original 2012 Estate tax return, the audit of the Barbara Schreier tax return would not been complicated by the appearance of a transfer from John to Barbara.

6. Other tax professionals consulted by Allan, and information on tax planning websites, both indicate that the John Schreier Revocable Intervivos Trust qualified for the MN farm deduction per the statues and rules in place at the time of John's passing. It is therefore the opinion of Allan that the "farm deduction" was the appropriate method tax sheltering mechanism at the time of John's passing. The information gathered to date, and Allan's subsequent is opinion, is refuted by Cindy Penning's claims that John's trust did not qualify for the MN farm deduction in 2012.

**Damages**

Part A.  Standard of care provided to the JJS and ABS trusts as a whole in execution and administration.

There was a resulting lawsuit stemming from the lack of requested action by the professionals associated with the trust. Allan legal costs are known. The total legal costs of Carl Schreier and Michelle Schreier, and minor children as heirs, are not known but estimates given. Some off Allan's and Carl's legal fees were allocated to the estate and these damages can be assessed to all three parties. The table below provides the total estimate of damages resulting from a lawsuit and the assessment damages to the three parties. It's not known if Carl and Michelle's action could be found contributory to the damages suffered by Allan.

| Party | Total fees | Fees Liable Estate (1/3 each) | Fees Liable individuals | Carl | Allan | Michelle |
|---|---|---|---|---|---|---|
| Carl | $50,000 (Est) | $14,875.5 | | $4,958.50 | $4,958.50 | $4,958.50 |
| Carl | | | $35,124.50 (Est) | $35,124.50 (Est) | | |
| Allan | $47,233.24 | $7,412.30 | | $2,470.77 | $2,470.76 | $2,470.77 |
| Allan | | | $39,820.94 | | $39,820.94 | |
| Michelle | $15,000 (Est) | 0 | | | | |
| Michelle | | | $15,000 (Est) | | | $15,000 (Est) |
| Total | $112,233.24 (Est) | $22,287.80 | $89,945.55 (Est) | $42,553.77 (Est) | $47,250.20 (Est) | $22,429.27 (Est) |

Part B.  Standard of care of provided to the ABS and JJS trusts in following the correct procedures in tax sheltering of the JJS and ABS trusts.

1. It's known that an additional $21,079 in new legal and accounting bills have been incurred, primarily to address and rectify the determination of the MN DOR Audit that substantial taxes, penalties, and interest were found due to the state of Minnesota.

2. It's known that an Alternate Appraisal was performed at the direction of Bill Wettering and Cindy Penning at a cost to the estate of $2,655. After the returns were required to be amended in 2015, it can be justified the Alternate Appraisal was not warranted. Cindy Penning recommended the

alternate appraisal be conducted in order to reduce the total estate of Barbra Schreier for the MN Estate tax return, which would be including the portion of John's estate from the marital deduction gained in 2012. John's 50% interest was valued around 2.8 million on his passing in 2012, and Barbara's 50% interest was expected to be about the same on her passing. However Barbara's 2.8 million dollar interest would be increased by 1.9 million dollars received from John in the marital deduction, resulting in a total estate value of 4.7 million dollars for Barbara's estate return. This 4.7 million dollar was in excess of the 3.8 million dollar farm deduction allowed by MN statute 291 and would result in some estate taxes being due. At the time of Barbara's passing, it was perceived that land values had dropped since John's passing and in the six months after Barbara's passing. Hence it was understandable to have an alternate appraisal prepared at a cost of $2,655, to receive a hope for significant reduction in the taxable valuation. But after the amending of John and Barbara's tax returns in 2015, the value of each of their estates was around 2.8 million, well below the 3.8 million dollar limitation. Therefore as it turned out, by not using the farm deduction on John's original 2012 estate return, an additional $2,655 was unnecessarily expended.

3. The use of the marital deduction on John's estate created numerous unwarranted accounting and legal complications in ongoing administration of the trusts and ensuing legal actions.

   a. Additional checking accounts, tax reports, and tax returns were necessary for the JJS marital trust and JJS credit trusts. Only one trust, the JJS Revocable Intervivos Trust, would have been sufficient by the amended estate tax returns.

   b. Partitioning of the land was complicated by the necessity of having to deed land into the JJS credit trust land before distributing all lands to the heirs. Extensive legal research into the process became unwarranted by the amended estate tax returns.

   c. The subsequent accounting and legal work in the proper accounting of the estate and cash flow of the credit trust checking account was greatly complicated by the existence of multiple trust checking accounts. The additional work became unwarranted by the amended estate tax returns.

4. There are untold other miscellaneous costs associated with the more complicated administration of the marital and credit trusts of John Schreier that fall into the administration of the Barbara Schreier trusts, as the assets and revenues of the John Schreier Marital trust were often comingled into the Barbara Schreier Trust. To date, and excluding fees for the recent audit process, over $19,471 have been expended on accounting fees. The original estimate for accounting services by Cindy Penning's firm was in the $4500 dollar range on John's estate. Based on that estimate, fees for the accounting of John and Barbara's estates have doubled.

EXHIBIT H (re-filed)

Issues Proposed by Allan Schreier for Arbitration

1. **Claims Against Accounting and Legal Firms re MN DOR Audit and Qualified Property Deduction Alleged Malpractice**

   A. **Drealan Kvilhaug Hoefker**

   Pursuant to a Conciliation Court Action 53-CO-16-232, the alleged malpractice for not filing a M706Q, Qualified Property Deduction (QPD), for the John Jerome Schreier Revocable Intervivos Trust (JJSRIT) in 2012 by accountant Cindy Penning of Drealan Kvilhaug Hoefker (DKH) shall be considered.

   Damages were incurred by the JJSRIT, the Ann Barbara Schreier Revocable Intervivos Trust (ABSRIT), and Allan Schreier as the result of said alleged malpractice and relief to the JJSRIT, ABSRIT and Allan Schreier is sought as follows:

   1. Relief to the JJSRIT, ABSRIT, and Allan Schreier of current charges of DKH fees per summary provided in the amount of $5435.00 to correct said malpractice.

| Name | ID | Invoices | Date | Fees | Credits |
|------|-----|----------|------|------|---------|
| Ann B. Schreier Rvoc. Intervivos Trust | | Credit (overpayment on previous work) | 7-20-15 (credit applied) | | - $120.00 |
| Ann B. Schreier Rvoc. Intervivos Trust | 60317 | 34555 | 7-14-15 | $ 398.00 | |
| | | 34972 | 10-19-15 | $ 408.00 | |
| | | 35162 | 11-24-15 | $ 2,609.00 | |
| | | 35316 | 12-22-15 | $ 130.00 | |
| | | 37475 | 3-28-16 | $ 903.00 | |
| John J. Schreier Estate | 60227 | 35161 | 11-24-15 | $ 863.00 | |
| John J. Schreier Rvoc. Intervivos Trust | 60243 | 37476 | 3-28-16 | $ 244.00 | |
| | | Total | | $ 5,555.00 | - $120.00 |
| | | Ledger Balance All Accounts | | $5435.00 | |

   2. Relief to the JJSRIT, ABSRIT, and Allan Schreier in the amount due to DKH for professional work encumbered by malpractice claims in the amount of $4,391.00, which are considered "Disputed Fees", resulting in a balance due of $1,044.00.

   3. Relief to the JJSRIT, ABSRIT, and Allan Schreier in the amounts previously paid to DKH and to Steve Prins Appraisal Services by the JJSRIT and ABSRIT in the amount of $6,694 per summary provided for professional services encumbered by malpractice claims performed in the unnecessary creation of a "JJS Credit Trust," including consultations and preparation of tax forms for the tax years of 2012, 2013, & 2014, and the recommendation to prepare and pay for an unnecessary "Alternate Appraisal" for the JJSRIT, resulting from alleged malpractice.

*marital*

1

*EXHIBIT 2*

2

| Description | Invoice # | Check No. | Date Paid | Fees | Disputed Charges |
|---|---|---|---|---|---|
| Preparation of 2012 JJS Credit Trust return | N/A | JJS Cr Trust #1004 | 8/14/13 | $ 969.00 | $ 969.00 |
| Preparation of 2013 JJS Credit Trust return | N/A | JJS Cr Trust #1007 | 3/26/14 | $ 250.00 | $ 250.00 |
| Preparation of 2014 JJS Credit Trust return | 32496 JJS Cr Trust | 912 ABS Rev Trust | 7/21/15 | $ 350.00 | $ 350.00 |
| Consultation and review for Alternate Appraisal and redoing 706 Forms | 33579 ABS Rev Trust | 912 ABS Rev Trust | 7/21/15 | $ 8,547.00 | $ 2,875.00 |
| | | | | Subtotal | $ 4,444.00 |
| | | | | | |
| Alternate Appraisal by Steve Prins | N/A | N/A | 6/8/15 | $ 2,250.00 | $ 2,250.00 |
| | | | | Subtotal | $ 2,250.00 |
| | | | | | |
| | | | | Total | $ 6,694.00 |

4. Relief to the JJSRIT, ABSRIT, and Allan Schreier of service charges, interest, and other similar fees, charged on disputed DKH professional fees subject to the claim of malpractice, currently believed to be in the amount of $1,235.

5. Relief to the JJSRIT, ABSRIT, and Allan Schreier of all service charges, interest, and other similar fees, charged on undisputed DKH professional fees, for which settlement and payment offers have been received and rejected, prior to and subsequently after, a written settlement offer made May 12, 2016 to Wayne Drealan, of DKH.

6. In Alternate Relief of paragraph (4) and (5), any service charges, interest, and other similar fees awarded to DKH from the JJSRIT and ABSRIT should be assessed to Trustee Carl Schreier pursuant to his refusal to attempt, or participate, in settling with DKH, for anything less than payment in full.

7. Relief to the JJSRIT, ABSRIT, and Allan Schreier of all professional fees incurred by Carl Schreier and Michelle Schreier on behalf of the JJSRIT and ABSRIT from Quinlivan and Hughes (QH), in remedying a claim for $113,127.59 in taxes, penalty and interest made by the Minnesota Department of Revenue. The QH fees known at this time are $15,493.

8. Relief to the JJSRIT, ABSRIT, and Allan Schreier of service charges, interest, and other similar fees, charged on QH professional fees subject to the claim of malpractice currently believed to be in the amount of $1,014.44.

9. In Alternate Relief of paragraph (7) and (8), any service charges, interest, and other similar fees awarded to QH from the JJSRIT and ABSRIT should be assessed to Trustee Carl Schreier pursuant to his retaining of QH to defend the malpractice of DKH, and/or his retaining QH without approval of the trustees, and/or his retaining QH for unnecessary work.

10. Relief to the JJSRIT, ABSRIT, and Allan Schreier of all or portions of arbitrator's fees to arbitrate these matters.

3

### B. Hedeen Hughes & Wetering

Pursuant to a Conciliation Court Action 53-CO-16-232, the occurrence of alleged malpractice for not properly advising and informing DKH and the trustees, in the filing a M706Q, Qualified Property Deduction (QPD) for the John Jerome Schreier Revocable Intervivos Trust (JJSRIT) in 2012 by Attorney William Wettering of Hedeen Hughes & Wetering, (HHW) shall be considered.

Additional issues of malpractice relevant to failing to properly advise and inform the trustees of the JJSRIT and ABSRIT of the longstanding and existing requirements upon the formation and continuation of the JJSRIT and ABSRIT, such trust documents being written and prepared by HHW, to be, and continue to be, registered entities with the MN Department of Agriculture in order to then be fully compliant with the current state law and then the subsequent requirements of the QPD, shall be considered.

Damages were incurred by the JJSRIT, ABSRIT and Allan Schreier as the result of alleged malpractice and relief to the JJSRIT, ABSRIT and Allan Schreier is sought as follows:

11. Relief to the JJSRIT, ABSRIT, and Allan Schreier from any DKH and QH fees expressed in Paragraph A that might have been avoided had the malpractice not been committed.
12. Relief to the JJSRIT, ABSRIT, and Allan Schreier from any fees related to discovering, researching, and advising, on the issue of the QPD malpractice, and in particular, the trust's noncompliance with the MN Department of Agriculture, as provided by QH to Carl Schreier and Michelle Schreier.
13. Relief to the JJSRIT, ABSRIT, and Allan Schreier of all or portions of arbitrator's fees to arbitrate these matters.

### C. Quinlivan & Hughes

Brought as a new issue re the alleged malpractice, the QPD return for the ABSRIT was prepared as of May 2015 under the guidance and direction of QH, on behalf of Carl Schreier, Trustee. This return was found to be in error by the MN DOR. At the same time, the ABSRIT return filed in May of 2015 was not in compliance with MN Department of Agriculture, even though it was certified to be such on the ABSRIT QPD return. QH did not advise DKH or the trustees properly on the initial QPD filing for the ABSRIT. As such, undetermined damages have occurred and relief to the JJSRIT, ABSRIT and Allan Schreier is sought as follows:

14. Relief to the JJSRIT, ABSRIT, and Allan Schreier from any DKH and QH fees expressed in Paragraph A that might have been avoided had the malpractice not been committed.
15. Relief to the JJSRIT, ABSRIT, and Allan Schreier from any of the associated $14,875 in fees awarded to QH in an Alternative Arbitration Settlement dated May 4, 2015, that are found related to the QPD malpractice.

## 2. Trustee Compensation to Allan Schreier for Professional Services He Rendered re the MN DOR Audit and Qualified Property Deduction.

Pursuant to actions above and beyond the normal duties expected of a trustee, and undertaken by Allan Schreier, Trustee of the JJSRIT and ABSRIT, Allan Schreier respectfully asks for arbitration to determine appropriate compensation to him for "Professional Services" provided by him to the ABSRIT and JJSRIT. The net gain realized by the JJSRIT and ABSRIT as a result of his services was $181,551.63. Damages and expenses were also incurred by Allan Schreier, with amounts to yet be determined. Relief for these damages and expenses is sought follows:

4

16. Relief to Allan Schreier based on a customary one-third percentage award for damages of legal and professional fees (out of a maximum of $19,884) recovered based on the outcome of this arbitration.
17. Relief to Allan Schreier based on a customary one-third percentage award for damages of recovery of $161,667.63 in trust assets plus reimbursement of his expenses (out of pocket expenses of $1,030.34 as of September 6, 2017).
18. Relief to Allan Schreier of all or portions of arbitrator's fees to arbitrate these matters.

In respect to this request, the following negative financial impacts were abated as the result of guidance and directives provided by Allan Schreier:

As result of the QPD malpractice by DKH, and/or failing to properly prepare QPD tax forms, a claim of $113,127.59 in taxes, penalty and interest was made against the ABSRIT by the Minnesota Department of Revenue. Upon request, the MN DOR did waive the penalty portion of the claim. The MN DOR then rejected a claimed refund by the ABSRIT of $63,102 and demanded an additional payment of $31,565.6, for a total claim of $94,667.63.

Actions directed by QH and carried out by DKH failed to remedy the MN DOR claim. Such actions were taken against the strongly expressed advice of Allan Schreier that the actions of QH, DKH, and Carl Schreier being attempted were futile and wasteful. The MN DOR rejected the attempts of QH and DKH to remedy the MN DOR claim. After the MN DOR rejection, the ABSRIT and JJSRIT were then found to be out of compliance with the MN Department of Agriculture, disqualifying <u>both</u> the JJSRIT and ABSRIT from using the QPD. This noncompliance subjected the ABSRIT and JJSRIT to taxes due to the MN DOR even greater than $94,667.63. The amount is undetermined. QH, DKH, and Carl Schreier were then at a standstill, with the only option being to pay the full amount of $94,667.63 claimed by the MN DOR.

Allan Schreier researched the matter and determined there was a method by which the ABSRIT and JJSRIT could become compliant the MN Department of Agriculture and would also successfully allow amending the tax returns for the JJSRIT and ABSRIT to fully utilize the QPD. The ABSRIT and JJSRIT returns were amended and were successful in remedying the MN DOR claim. Allan Schreier's advice, guidance, and action resulted in the ABSRIT receiving a refund of $67,000. The refund received was even higher than the original refund of $63,102 sought by DKH. The net difference between paying $94,667.63 and receiving $67,000 is $161,667.63 to the ABSRIT and shared by all heirs.

The actions of QH and DKH resulted in claims against the ABSRIT in the amounts of $15,493 and $5,435 ($5,437), less $1,044 of approved DKH fees, for a total financial loss of $181,551.63 to the ABSRIT.

Allan Schreier had to endure a great deal of stress in dealing with the unresponsive professionals at DKH and QH, as well as Carl Schreier. Allan Schreier spent considerable time on the matter, employing the legal and accounting skills acquired over a 30 year career as a professional engineer and 15 years of experience as a business owner. Allan Schreier seeks compensation from the trust for the extraordinary efforts provided and results achieved.

3.  <u>2014 K1's</u>

Pursuant to Carl Schreier Schedule A, Item 5, Allan Schreier stipulates he allowed the IRS to remove $365 as taxes due from ABSRIT from the ABSRIT checking account. The $365 in taxes due the IRS resulted from DKH erroneously reporting $3,179.00 ($9,537 total) in K1 distributions made equally to each heir in 2014 tax returns. The K1 distributions were not authorized by the trustees. The distributions

EXHIBIT H (re-filed)

5

were never paid by the ABSRIT. Upon Trustee Allan Schreier's discovery of this malpractice, and the same being made known to Trustee Carl Schreier, Carl Schreier would not approve having the erroneous 2014 tax returns and K1's corrected, nor would he allow the K1's to be distributed. Carl Schreier engaged QH to present false statements regarding the K1's. In lieu of pursuing arbitration or legal action, Allan Schreier conferred with the IRS to remedy the impasse. The IRS determined that since the K1 distributions remained in the ABSRIT, the ABSRIT was then responsible for the taxes due and subsequently removed $365 from the ABSRIT checking account, but only for the K1 reported to Allan Schreier. As a result, Allan Schreier has received a benefit of $365 that the other beneficiaries have not received, constituting damages to the other ABSRIT Beneficiaries. Pursuant to emails, Allan Schreier believes Carl Schreier conferred extensively with DKH and QH on the matter of "2014 K1's and incurred significant expenses included in the QH legal fees of $29,769 provided in Carl Schreier Schedule A, Item 2, constituting damages to the ABSRIT and relief is sought as follows:

19. Relief to the remaining beneficiaries of the ABSRIT Trust that each receive $365 ($365 to Carl and $365 divided equally to Taylor, McKenna, and Zachary) from the ABSRIT as it is truly appropriate, and as directed by the IRS, that the ABSRIT Trust bear these expenses.
20. Relief to the ABSRIT and Allan Schreier for the portions of the $29,769 in legal fees of QH related to "2014 K1's," and that these expenses are borne by DKH, or in the alternate, by Carl Schreier.
21. Relief to the JJSRIT, ABSRIT, and Allan Schreier of all or portions of arbitrator's fees to arbitrate these matters.
22. In alternate relief to Items 19, 20 & 21, Allan Schreier seeks relief in that this matter and disputed fees, that QH be added to the malpractice claim to DKH as a possible contributor to this malpractice.

4.   **Trust Administration Malpractice by Trust Professionals**

The occurrence of alleged malpractice of DKH for not properly advising and informing the trustees in all matters of administering the JJSRIT and ABSRIT, commencing in Spring of 2010 when the diminishing capacity of John Schreier due to Alzheimer's/dementia made him incapable of administering his own trust, shall be considered.

The occurrence of alleged malpractice of HHW for not properly advising and informing the trustees and DKH in all matters of administering the JJSRIT and ABSRIT, commencing in Spring of 2010 when the diminishing capacity of John Schreier due to Alzheimer's/dementia made him incapable of administering his own trust, shall be considered.

The alleged malpractice was mutual to DKH and HHW, with possible individual responsibilities. DKH assisted Carl Schreier by disregarding written trust controls of having trustee approval of such matters as managing trust assets, making trust distributions, making gifts from the trusts or individuals, preparing trust administration reports and financial statements, approving tax returns and tax payments or refunds, allowing other persons, namely Ann Barbara Schreier to act as trustee for the JJSRIT without first taking written trust actions necessary to act, and other matters stemming from lack of control.

Regarding an issue of alleged gift of well improvements, alleged malpractice occurred. DKH failed to obtain or keep proper records, nor did DKH provide proper tax return documentation of said gift. DKH recalled said gift after two years of ongoing legal actions in last minute proceedings of arbitration favoring Trustee Carl Schreier, failing to inform trustee Allan Schreier of said approval of gift at the time gift was made, and failing to acknowledge said gift until last minute proceedings of arbitration.

HHW alleged malpractice would include all alleged malpractices of DKH, directly or indirectly assisting Carl Schreier, and further include not advising DKH or Ann Barbara Schreier, or Carl Schreier, that the JJSRIT was not being administered properly. In particular, malpractice occurred for not advising Ann

6

Barbara Schreier and Carl Schreier that farm leases for the management of trust assets were improperly prepared and approved.

In order to cease Carl Schreier's breaches of fiduciary responsibilities, Allan Schreier first offered a Private Agreement, which was rejected by Carl Schreier.   Allan Schreier then commenced a lawsuit to cease Carl Schreier's breaches of fiduciary responsibilities.  The intent of the lawsuit was to determine and collect the unrealized assets of the ABSRIT and JJSRIT by compelling an accounting of the trusts, and to partition the trust assets.  Prior to and up until the conclusion of that lawsuit on or around May 4, 2015, DKH and HHW continued to assist Carl Schreier in his breaches.  DKH and HHW did not control their own actions by advising Carl Schreier to cease his breach, proceeding with trust administration actions knowing them to be in breach, and preventing the creation of a stalemate resulting in Carl Schreier having to relent in his breach.

Damages were incurred by the JJSRIT, ABSRIT and Allan Schreier as the result of alleged malpractice and resulting lawsuit.  Relief to the JJSRIT, ABSRIT and Allan Schreier is sought as follows:

23. Alleged malpractice by DKH and HHW greatly increased the tension between trustees in resolution of all trust matters.  The ABSRIT legal fees were $14,875.50 and $7,412.30 for what is understood by Allan Schreier to be for preparation and finalizing a mediated settlement, partition of trust assets (farmland), and overseeing estate and trust tax returns.  The fees, especially relating to the mediated settlement are certainly excessive.  Relief is sought from DKH and HHW for excessive legal fees paid by the ABSRIT and JJSRIT.

24. Alleged malpractice by DKH may have greatly increased legal fees in the amount of $29,769 now claimed by Carl Schreier if this claim, yet undocumented to Allan Schreier, covers the period of time when the gift of well improvements was being disputed in particular.

25. Alleged malpractice by DKH and HHW made it necessary for Trustee Allan Schreier to commence a lawsuit to cease the breach of Carl Schreier.  Legal fees incurred by Allan Schreier amounted to $37,745.44.  Relief is sought from DKH and HHW for excessive legal fees paid by Allan Schreier.

26. Alleged malpractice by DKH and HHW has caused a great cost in time and resources of Allan Schreier in the representation of himself in trust matters.  Relief is sought from DKH and HHW for such impacts to Allan Schreier.

## 5.   Breach of Fiduciary Responsibilities in Trust Administration by Carl Schreier

### A.   Distribution of Personal Effects of Ann Barbara Schreier

The personal effects of Ann Barbara Schreier, such as pictures and photo albums have yet to be distributed. Allan Schreier has made multiple attempts to coordinate with Carl Schreier, and/or Michelle Schreier, with little or no response, cooperation or effort received.

27. Therefore, Allan Schreier seeks relief in arbitration to compel Carl Schreier, and/or Michelle Schreier to deliver all the personal effects of Ann Barbara Schreier to Allan Schreier, setting place, date and time within 30 days, so that Allan Schreier may gather up and coordinate the distribution of these personal effects to the heirs.  Allan Schreier also asks that the arbitrator order that duplicates be made where more than one party seeks possession of pictures or photo albums.

### B.   Protection of Trustees and Estate from Federal and State Tax Consequences.

The ABSRIT and JJSRIT may be exposed to federal and state audits, taxes, penalties, and interest because of alleged falsified and misstated tax returns as directed by Carl Schreier, and abetted by DKH.  For example, any and all distributions made to Barbra Schreier from the John Schreier "Credit Trust" may be fraudulent,

7

and if these distributions were so held in an audit, significant, taxes, interest and penalty would be realized. Similarly, the amount of underpaid rents constituted substantial gifts which were also not reported. Pursuant to an offer of Private Agreement dated May 2014, Paragraph 5, Allan seeks indemnification for the ABSRIT, JJSRIT, and Allan Schreier as Trustee, from Carl Schreier for any of his "Breach of Fiduciary Responsibilities" including self-dealing activities engaged in while acting as a sole trustee in the administration of the trusts.

These consequences, if incurred, would be of no fault of Allan Schreier, ABSRIT or JJSRIT. Relief to these damages is sought follows:

28. Relief to the JJSRIT, ABSRIT, and Allan Schreier of any and all taxes, penalties, interest, accounting fees, legal fees, arising from federal and state tax returns, related to Carl's Breach of Fiduciary Responsibilities.

**C.   Protection of Trust Assets – Carl Schreier to Ann Barbara Schreier Promissory Note**

Pursuant to the Private Agreement dated May 14, Item 7, the estate of Ann Barbara Schreier was in the possession of an $80,000 Promissory Note, dated February 17, 2010, from Carl Schreier. Attempts by Allan Schreier to collect this debt for the estate were being thwarted by Carl Schreier. When the Private Agreement was rejected in full by Carl Schreier, Allan Schreier commenced legal action to collect this debt. This debt was settled on or around June 16, 2014 and the legal matter concluded on or around June 27, 2014. In doing so, Allan Schreier incurred legal fees of $4,850.50, thru June 27, 2014, which constitute the damages to Allan Schreier. Relief to these damages is sought follows:

29. Relief from the ABSRIT to the Allan Schreier for legal fees in the amount of $4,850.50.
30. In alternate relief, the legal fees associated with collection of this debt shall be assessed to Carl Schreier.

**D.   Protection of Trust Assets – Ann Barbara Personal Property**

Attempts to collect the personal property, namely a car of Ann Barbara Schreier, were thwarted by Carl Schreier compelling Allan Schreier to threaten and or undertake legal actions to compel Carl Schreier to surrender such car. Ultimately compelling Carl Schreier to surrender the car and have it sold, was achieved through such action, which constitute damages to Allan Schreier. Relief to these damages is sought follows:

31. Relief from the ABSRIT to the Allan Schreier for those legal fees contained in a claim of $37,745.44 associated with the collection of this asset.
32. In alternate relief, the legal fees associated with collection of this asset shall be assessed to Carl Schreier.

**E.   Documentation of Trust Administration – Alleged Gift of Well Improvements**

Pursuant to an Alternate Dispute Resolution, Carl Schreier alleged that Ann Barbara Schreier made a gift for improving a well on Michelle Schreier's property. Carl Schreier did not seek written documentation of such gift nor did he advise Allan Schreier of such gift at the time the alleged gift was made. This gift was disputed and yet unspecified damages may have occurred, re a claim of $29,769 from Carl Schreier for legal fees. Damages may be incurred as a result of Carl Schreier breach of fiduciary responsibilities and relief is sought as follows:

33. Any legal fees associated with gift of well improvements shall be assessed to Carl Schreier.

EXHIBIT H (re-filed)

8

34. In additional relief, any legal fees associated with Carl Schreier's failure to document trust administration activities, gain approvals of trust administration actions, and other breaches of fiduciary responsibilities, shall be assessed to Carl Schreier.

## F.  Continued Breach of Fiduciary Responsibilities

Since the completion of the Alternative Dispute Resolution dated May 5, 2015, Carl Schreier has continued to be in breach of his fiduciary duties to the trust in that his actions continue to serve his interest and continue the discord in the trustees. Based on Carl Schreier's past actions and continued actions, Allan Schreier seeks relief from the situation by seeking arbitration to immediately remove Carl Schreier from his trustee position.

a.  Carl Schreier has closed various trust checking accounts at his own discretion and decision, even though there were no monthly fees associated with keeping the accounts open. Closing checking accounts makes it more difficult to review and monitor possible past and ongoing irregularities in the administration of the trust.

b.  Carl Schreier has had the preparing and sending of paper checking account statements for trust checking accounts stopped, even though these services were still free for the trust. Having monthly paper statements makes it easier to review and monitor possible ongoing irregularities in the administration of the trust.

c.  Carl Schreier maintains control of the trust checkbooks, refusing to relinquish any control to Allan Schreier.

d.  Carl Schreier has denied making changes or taking actions, saying the bank is the problem. When questioned, the bank has confirmed, in writing on occasion, Carl Schreier is directing these actions.

e.  Carl Schreier has changed the authorizations on the trust checking to a mandatory two-signature requirement. This makes it difficult, if not impossible, for Allan Schreier to execute any trust administration, even when it in the best interest of the trust, when it does not serve Carl Schreier self-interested purposes.

f.  In preparation of the 2014 tax returns, in May of 2015, Carl Schreier refused to share the basic data provided to the accountant, but demanded Allan Schreier approve and sign off on the 2014 returns. Allan Schreier was even threatened with a lawsuit if he didn't sign off, even though any approval would be falsely given. Allan Schreier had serious reservations about the accuracy of the 2014 returns and stated these opinions to Carl Schreier and DKH. DKH was uncooperative in explaining or addressing any concerns. Carl Schreier created "emergency" situations related to filing deadlines by failing to act timely and promptly and then expected Allan Schreier to sign off for convenience.

g.  When the MN DOR claim was first received, rather than discuss what had happened and what the problem was, Carl Schreier refused to even discuss considering that malpractice might have occurred. Carl Schreier allowed and/or authorized the defending of any malpractice by DKH or HHW by retaining QH to advise DKH. Despite repeated and strongly worded opinions from Allan Schreier that this was a major mistake and placed the trust at risk for negative results, Carl Schreier proceeded on his own. Then, as warned against by Allan Schreier, Carl Schreier proceeded to incur legal and accounting fees of $20,928 and the ABSRIT Trust was still liable for a claim of $94,667.63 from the MN DOR. Even at that point, Carl Schreier refused to consider the possibility of pursing malpractice against DKH for failing to deliver a legal tax sheltering mechanism, following a perfectly legitimate and approved process provided by the State of Minnesota.

h.  Carl Schreier indicated he felt DKH had indeed "made a mistake" at some point, but was still not willing to pursue it. Allan Schreier pursued the possibility of a malpractice claim on his own accord and presented some promising preliminary findings to Carl Schreier. Carl Schreier indicated if Allan Schreier could find an attorney with a similar favorable preliminary finding, he

9

would entertain the idea that malpractice could be successfully proven against DKH. Allan Schreier engaged with an attorney, Jack Carlson, who agreed with Allan Schreier that malpractice likely occurred and could be made into a case. Allan Schreier shared this contact information with Carl Schreier who proceeded to call Mr. Carlson. After this contact with Carl Schreier, Mr. Carlson relayed to Allan Schreier that he was no longer interested in pursuing the claim as Carl Schreier had been argumentative and it was likely Carl Schreier would interfere and prevent the successful prosecution of the malpractice claim. That prophecy has been fulfilled, resulting in Allan Schreier incurring additional attorney's fees and expenses in an amount which continues to accrue.

6. **General.**

   a. The acts and omissions referred to above shall be taken into account in determining the reasonableness of any fees charged for the same.
   b. The arbitrator shall determine who shall pay the arbitrator's fees.
   c. To the extent the arbitrator deems appropriate, Allan Schreier shall be awarded his reasonable attorney's fees and expenses incurred regarding the aforesaid matters and this arbitration.
   d. Allan Schreier seeks to recover his damages only once but has included them as alternative relief depending on how the arbitrator resolves certain matters.
   e. The JJSRIT and the ABSRIT shall be terminated upon the carrying out of the final decision of the arbitrator.
   f. The foregoing is based upon information currently known by Allan Schreier and he reserves the right to make changes in the above if new information is discovered.



Summary of Allan Schreier's Abitration Issues Financial Outcomes
12/5/2017

| | Relief Item | Amount or Maximum | For | Assignment ABS JJS RIT | Carl | Allan | Minor Children | Voided | DKH | HHW | QH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 1.A.2.1 | $ 4,391.00 | disputed charges for DKH audit | $ - | | | | $ (4,391.00) | | | |
| 3 | 1.A.2.2 | $ 1,044.00 | un-disputed charges for DKH audit | $ (1,044.00) | | | | | $ 1,044.00 | | |
| 4 | 1.A.3 | $ 6,694.00 | overpaid fees to DKH for tax retruns and extra appraisal | $ 6,694.00 | | | | | $ (6,694.00) | | |
| 6 | 1.A.4 | [redacted] | total service charges disputed charges for DKH audit | | | | | $ (1,235.00) | | | |
| 9 | 1.A.7 | $ 15,493.00 | disputed charges for QH audit | | | | | | $ (15,493.00) | | $ 15,493.00 |
| 10 | 1.A.8 | [redacted] | total service charges disputed charges for QH audit | | | | | | $ (1,014.44) | | $ 1,014.44 |
| 23 | 2.17-1 | [redacted] | recovery of damages by Allan, out of pocket expenses | | | $ 1,030.34 | | | $ (1,030.34) | | |
| 31 | 4.23.1 | $ 8,989.50 | Recovery of damages in MSA (Carl legal, $14,875.5) (80% DKH, 20% HHW) | $ 8,989.50 | $ - | $ - | $ - | | $ (7,191.60) | $ (1,797.90) | |
| 32 | 4.23.2 | $ 7,412.30 | Recovery of damages in MSA (Allan legal) (80% DKH, 20% HHW) | $ 7,412.30 | $ - | $ - | $ - | | $ (5,929.84) | $ (1,482.46) | |
| 34 | 4.25 | $ 37,745.44 | damages by allan re mediated settlement (80% DKH, 20% HHW) | | | $ 37,745.44 | | | $ (30,196.35) | $ (7,549.09) | |
| | | | | | | | | | | | |
| 28 | 3.20 | $ 29,769.00 | damages re 2014 k1's | | TBD ded | | | | TBD ded | TBD ded | TBD add |
| 27 | 3.19 | $ 730.00 | damages to heirs 2014 K1's | $ (730.00) | $ 365.00 | | $ 365.00 | | | | |
| 38 | 5.C.29 | $ 4,850.50 | recovery of damages collection of assets by Allan (Promissory Note) | $ (4,850.50) | | $ 4,850.50 | | | | | |
| 22 | 2.17 | $ 161,667.63 | recovery of damages by Allan for audit malpratice (one third) | $ (53,889.21) | | $ 53,889.21 | | | TBD ded | TBD ded | TBD ded |
| | 2.16 | $ 12,320.00 | recovery of DKH damages 1.A.2.1, 1.A.3, 1.A.4 by Allan (one third) | $ (4,106.67) | | $ 4,106.67 | | | TBD ded | TBD ded | TBD ded |
| | 2.16 | $ 16,507.44 | recovery of QH damages 1.A.7, 1.A.8 by Allan (one third) | $ (5,502.48) | | $ 5,502.48 | | | TBD ded | TBD ded | TBD ded |
| | 2.16 | $ 16,401.80 | recovery of MSA damages 4.23.1, 4.23.2 by Allan (one third) | $ (5,467.27) | | $ 5,467.27 | | | TBD ded | TBD ded | TBD ded |
| | 2.17 | [redacted] | Fees MGO & others (80% DKH, 20% HHW) | | | $ 100,000.00 | | | $ (80,000.00) | $ (20,000.00) | |
| | | | Totals | $ (52,494.32) | $ 365.00 | $ 212,591.90 | $ 365.00 | $ (5,626.00) | $ (146,505.57) | $ (30,829.45) | $ 16,507.44 |

| Summary | Trust | Carl Schreier | Allan Schreier | Minor Children | | DKH | HHW | QH |
|---|---|---|---|---|---|---|---|---|
| Trust Balance 12-5-17 | $ 56,286.42 | | | | | | | |
| Reimbursements by DKH | $ 146,505.57 | | | | | $ (146,505.57) | | |
| Reimbursements by HHW | $ 30,829.45 | | | | | | $ (30,829.45) | |
| Disbursement to QH | $ (16,507.44) | | | | | | | $ 16,507.44 |
| Disbursement to Carl | $ (365.00) | $ 365.00 | | | | | | |
| Disbursement to Allan | $ (212,591.90) | | $ 212,591.90 | | | | | |
| Disbursement to Minor Children | $ (365.00) | | | $ 365.00 | | | | |
| Trust Closeout to/from Carl | $ (1,264.03) | $ 1,264.03 | | | | | | |
| Trust Closeout to/from Allan | $ (1,264.04) | | $ 1,264.04 | | | | | |
| Trust Closeout to/from Minor Children | $ (1,264.03) | | | $ 1,264.03 | | | | |
| Balances | $ (0.00) | $ 1,629.03 | $ 213,855.94 | $ 1,629.03 | | $ (146,505.57) | $ (30,829.45) | $ 16,507.44 |

| | Relief Item | Amount or Maximum | For | ABS JJS RIT | Carl | Allan | Minor Children | Voided | DKH | HHW | QH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1.A.1 | $ 5,435.00 | total charges for DKH audit | | | | | | | | |
| 5 | 1.A.3-1 | TBD | interest owed to trust on overpaid fees | TBD add | | | | | TBD ded | | |
| 7 | 1.A.5 | TBD | service charges un-disputed charges for DKH audit | | | | | TBD add | | | |
| 8 | 1.A.6 | [redacted] | [redacted] | | | | | | | | |
| 11 | 1.A.9-1 | [redacted] | [redacted] | | | | | | | | |
| 12 | 1.A.9-2 | [redacted] | [redacted] | | | | | | | | |
| 13 | 1.A.10 | TBD | arbitration fees Part A | | TBD ded | | | | TBD ded | TBD ded | TBD ded |
| 14 | 1.A.10-1 | [redacted] | [redacted] | | TBD ded | TBD add | | | TBD ded | TBD ded | TBD ded |
| 15 | 1.B.11 | $ 19,884.00 | disputed charges for DKH QH audit assessed to HHW ($4391+$15493 | TBD add | | TBD add | | | | TBD ded | |
| 16 | 1.B.12 | $ 19,884.00 | disputed charges for DKH QH MN Dept of AG assessed to HHW ($4391+$15493 | TBD add | | TBD add | | | | TBD ded | |
| 17 | 1.B.13 | TBD | arbitration fees Part B | | | | | | | TBD ded | |
| 18 | 1.B.13-1 | [redacted] | [redacted] | | TBD ded | TBD add | | | | TBD ded | |
| 19 | 1.C.14 | $ 19,884.00 | disputed charges for QH audit re qpd malpractice ($4391+$15493) | | | | | | TBD add | | TBD ded |
| 20 | 1.C.15 | $ 14,875.50 | disputed charges for QH mediated settlement re QPD malpractice | TBD add | | | | | | | TBD ded |
| 21 | 2.16 | $ 19,884.00 | recovery of damages by Allan (one third) | $ (6,628.00) | | $ 6,628.00 | | | TBD ded | TBD ded | TBD ded |
| 24 | 2.17-2 | TBD | recovery of damages by Allan, MGO legal fees malpractice claims | TBD ded | TBD ded | TBD add | | | TBD ded | TBD ded | TBD ded |
| 25 | 2.17-3 | TBD | recovery of damages by Allan, MGO legal fees for arbitration of malpractice | TBD ded | TBD ded | TBD add | | | TBD ded | TBD ded | TBD ded |
| 26 | 2.18 | TBD | arbitration fees Part 2 | TBD ded | TBD ded | TBD add | | | TBD ded | TBD ded | TBD ded |
| 29 | 3.21 | TBD | arbitration fees Part 3 | | TBD ded | | | | TBD ded | | TBD ded |
| 30 | 3.22 | [redacted] | [redacted] | | | | | | | | TBD ded |
| 33 | 4.24 | $ 29,769.00 | Recovery of damages from Carl's claim of legal fees (80% DKH, 20% HHW) | | | | | | $ (23,815.20) | $ (5,953.80) | $ 29,769.00 |
| 35 | 4.26 | TBD | unspecified damages by allan re mediated settlement | | | TBD add | | | TBD ded | TBD ded | |
| 36 | 5.A.27 | TBD | distribution of personal effects by Allen | TBD ded | | TBD add | | | | | |
| 37 | 5.B.28 | TBD | indemnification from damages breach | TBD ded | | TBD add | | | TBD ded | TBD ded | TBD ded |
| 39 | 5.C.30 | [redacted] | [redacted] | | | | | | | | |
| 40 | 5.D.31 | $ 37,745.44 | Recovery of damages collection of assets by Allan | TBD ded | | TBD add | | | | | |
| 41 | 5.D.32 | [redacted] | [redacted] | | TBD ded | TBD add | | | | | |
| 42 | 5.E.33 | TBD | recovery of any damage related to all accounting malpractices (eg. Well) | | TBD ded | TBD add | | | | | |
| 43 | 5.E.34 | TBD | recovery of any damage related to breach | | TBD ded | TBD add | | | | | |

**Summary of Allan Schreier's Arbitration Issues Financial Outcomes**
12/9/2017

| Relief Item | Amount or Maximum | For | ABS_US RET | Carl | Allan | Minor Children | Violad | DKH | HHW | OH |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.A.1.1 | $4,395.00 | unrefunded charges for DKH audit | $(4,395.00) | | | | | $4,395.00 | | |
| 1.A.1.2 | $1,044.00 | un-disputed charges for DKH audit | $(1,044.00) | | | | | $1,044.00 | | |
| 1.A.3 | $6,694.00 | overpaid fees to DKH for tax returns and extra appraisal | $6,694.00 | | | | | $(6,694.00) | | |
| 1.A.4 | | total service charges disputed charges for DKH audit | | | | | $(1,235.00) | | | |
| 1.A.7 | $55,489.00 | disputed charges for OH audit | | | | | | | | $15,489.00 |
| 1.A.8 | $1,014.44 | total service charges disputed charges for OH audit | | | | | | | | $1,014.44 |
| 2.17.1 | $1,030.34 | recovery of damages by Allan, out of pocket expenses | | | $1,030.34 | | | | | |
| 4.23.1 | $8,989.50 | Recovery of damages in MSA (Carl legal) $14,875.5) (80% DKH, 20% HHW) | $8,989.50 | $-- | | | | $(7,191.60) | $(1,797.90) | |
| 4.23.2 | $7,412.30 | Recovery of damages in MSA (Allan legal) (80% DKH, 20% HHW) | $7,412.30 | $-- | | | | $(5,929.84) | $(1,482.46) | |
| 4.25 | $37,745.44 | damages by allan re mediated settlement (80% DKH, 20% HHW) | $37,745.44 | | | | | $(30,196.35) | $(7,549.09) | |
| 3.20 | $29,769.00 | damages to 2014 k1's | | 365.00 | | | | TBD ded | TBD ded | TBD ded |
| 3.19 | $730.00 | damages to heir 2014 K1's | $(730.00) | 365.00 | | | | | | |
| 5.C.29 | $4,850.50 | recovery of damages collection of assets by Allan (Promissory Note) | $(4,850.50) | | $4,850.50 | | | TBD ded | TBD ded | TBD ded |
| | $53,859.21 | recovery of damages by Allan for audit malpractice (one third) | $(53,859.21) | | $53,859.21 | | | TBD ded | TBD ded | TBD ded |
| 2.16 | $12,320.00 | recovery of DKH damages 1.A.1, 1.A.3, 1.A.4 by Allan (one third) | $(4,106.67) | | $4,106.67 | | | TBD ded | TBD ded | TBD ded |
| 2.16 | $16,507.44 | recovery of OH damages 1.A.7, 1.A.8 by Allan (one third) | $(5,502.48) | | $5,502.48 | | | TBD ded | TBD ded | TBD ded |
| 2.16 | $16,401.80 | recovery of MSA damages 4.23.1, 4.23.2 by Allan (one third) | $(5,467.27) | | $5,467.27 | | | TBD ded | TBD ded | TBD ded |
| 2.17 | $100,000.00 | Fees MGG & others (80% DKH, 20% HHW) | $100,000.00 | | $100,000.00 | | | $(80,000.00) | $(20,000.00) | |
| | | **Totals** | $(52,494.32) | 365.00 | $212,591.90 | 365.00 | $(5,626.00) | $(146,505.57) | $(30,829.45) | $16,507.44 |
| | | **Summary** | **Trust** | **Carl Schreier** | **Allan Schreier** | **Minor Children** | **Violad** | **DKH** | **HHW** | **OH** |
| | $56,286.42 | Trust Balance 12-5-17 | $56,286.42 | | | | | | | |
| | $146,505.57 | Reimbursement by DKH | $146,505.57 | | | | | $(146,505.57) | | |
| | $30,829.45 | Reimbursement by HHW | $30,829.45 | | | | | | $(30,829.45) | |
| | $16,507.44 | Disbursement to Carl | $(16,507.44) | 365.00 | | 365.00 | | | | $16,507.44 |
| | $(211,591.90) | Disbursement to Allan | $(211,591.90) | | $212,591.90 | | | | | |
| | $(365.00) | Disbursement to Minor Children | $(365.00) | 365.00 | | 365.00 | | | | |
| | $(1,264.03) | Trust Closeout to/from Carl | $(1,264.03) | 1,264.03 | | | | | | |
| | $(1,264.03) | Trust Closeout to/from Allan | $(1,264.03) | | 1,264.03 | | | | | |
| | $(1,264.03) | Trust Closeout to/from Minor Children | $(1,264.03) | | | 1,264.03 | | | | |
| | | **Balances** | $(0.00) | $1,629.03 | $213,855.94 | $1,629.03 | | $(146,505.57) | $(30,829.45) | $16,507.44 |
| 1.A.1 | $5,435.00 | total charges for DKH audit | TBD add | | | | | | | |
| 1.A.5 | TBD | interest on the loaned trust reserved fees | TBD add | | | | | | | |
| 1.A.5 | TBD | service charges un-disputed charges for DKH audit | TBD add | | | | | | | |
| 1.A.6 | $1,235.00 | alt 4 | $1,235.00 | | | | | | | |
| 1.A.6 | $16,507.44 | alt 2 & 3 | $16,507.44 | | | | | | | |
| 1.A.10 | TBD | arbitration fees Part A | TBD add | | | | | | | |
| 1.A.10-1 | | | TBD add | | | | | | | |
| 1.A.10-4 | $9,884.00 | disputed charges for DKH OH audit assessed to HHW [$4391+$15489] | TBD add | | | | | TBD ded | TBD ded | |
| 1.B.12 | $9,884.00 | disputed charges for DKH OH MN Dept of AG assessed to HHW [$4391+$15489] | TBD add | | | | | TBD ded | TBD ded | |
| 1.B.13 | TBD | arbitration fees Part B | TBD add | | | | | TBD ded | TBD ded | |
| 1.B.13-1 | | | TBD add | | | | | TBD ded | TBD ded | |
| 1.C.15 | $9,884.00 | disputed charges for OH audit re malpractice [$4391+$15489] | $(6,628.00) | | 6,628.00 | | | TBD ded | TBD ded | |
| 2.16 | $9,884.00 | recovery of damages by Allan, MGD legal fees malpractice claims | TBD add | | TBD ded | | | TBD ded | TBD ded | |
| 2.17.3 | TBD | recovery of fees for Allan, MGD legal fees re arbitration of malpractice | TBD add | | TBD ded | | | TBD ded | TBD ded | |
| 2.18 | TBD | arbitration fees Part 2 | TBD add | | TBD ded | | | TBD ded | TBD ded | |
| 3.21 | TBD | arbitration fees Part 3 | TBD add | | TBD ded | | | TBD ded | TBD ded | |
| 3.22 | | | TBD add | | | | | | | |
| 4.24 | $29,769.00 | Recovery of damages from Carl's claim of legal fees [80% DKH, 20% HHW] | TBD add | | | | $(23,815.20) | $(5,953.80) | $29,769.00 | |
| 4.26 | TBD | unspecified damages by allan re mediated settlement | TBD add | | | | | | | |
| 5.A.27 | TBD | distribution of personal effects by Allan | TBD add | | | | | | | |
| 5.B.28 | TBD | distribution of the Trust assets | TBD add | | | | | | | |
| 5.C.30 | | | TBD add | | | | | | | |
| 5.D.31 | $37,745.44 | Recovery of damages collection of assets by Allan | $37,745.44 | | | | | | | |
| 5.D.32 | TBD | recovery of any damage related to all accounting malpractice (eg, Weil) | TBD add | | TBD ded | | | | | |
| 5.E.33 | TBD | recovery of any damage related to breach | TBD add | | TBD ded | | | | | |
| 5.E.34 | | recovery of any damage related to breach | TBD add | | TBD ded | | | | | |

Summary of Allan Schreiber's Arbitration Issues Financial Outcomes

| Relief Item | Amount or Minimum | for | ABS JIS JNT | Carl | Allan | Minor Children | Voided | DKH | HHW | QH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Assignment | | | |
| 1.A.2.1 | $ 4,391.00 | disputed charges for DKH audit | | | | | $ (4,391.00) | | | |
| 1.A.2.2 | $ 1,044.00 | un-disputed charges for DKH audit | $ (1,044.00) | | | | | $ 1,044.00 | | |
| 1.A.3 | $ 6,694.00 | overpaid fees to DKH for tax returns and extra appraisal | $ (6,694.00) | | | | | $ (6,694.00) | | |
| 1.A.6 | | disputed charges for DKH audit | | | | | $ (1,235.00) | | | |
| 1.A.7 | $ 15,493.00 | disputed charges for QH audit | | | | | | $ (15,493.00) | | $ 15,493.00 |
| 1.A.8 | $ 1,014.44 | total service charges disputed charges for QH audit | | | | | | $ (1,014.44) | | $ 1,014.44 |
| 2.17-1 | | recovery of damages by Allan, out of pocket expenses | | | $ 1,090.34 | | | $ (1,090.34) | | |
| 4.23.1 | $ 8,989.50 | Recovery of damages in NGA (Carl legal, 35/4,075.33) (80% DKH, 20% HHW) | 8,989.50 | | | | | $ (7,191.60) | $ (1,797.90) | |
| 4.23.2 | $ 7,412.30 | Recovery of damages in NGA (Allan legal) (80% DKH, 20% HHW) | 7,412.30 | | | | | $ (5,929.84) | $ (1,482.46) | |
| 4.25 | $ 37,745.44 | damages by allan in mediated settlement (80% DKH, 20% HHW) | 37,745.44 | | 37,745.44 | | | $ (30,196.35) | $ (7,549.09) | |

| 3.20 | 29,769.00 | damages in 2014 k1's | (730.00) | | | 365.00 | | TBD ded | TBD ded | TBD ded |
| 3.19 | 29,769.00 | damages to heirs 2014 k1's | (4,850.50) | | 4,850.50 | | | | | |
| 4.25 | 4,850.50 | recovery of damages collection of assets by Allan (Promissory Note) | (53,889.21) | | 53,889.21 | | | | | |
| 2.37 | 361,467.63 | recovery of damages by allan for audit malpractice (one third) | (4,106.67) | | 4,106.67 | | | TBD ded | TBD ded | TBD ded |
| 2.16 | 12,320.00 | recovery of DKH damages  1.A.2.1, 1.A.3, 1.A.4  by Allan (one third) | (5,502.48) | | 5,502.48 | | | TBD ded | TBD ded | TBD ded |
| 2.16 | 16,507.44 | recovery of QH damages  1.A.7, 1.A.8 by Allan (one third) | (5,467.27) | | 5,467.27 | | | | | TBD ded |
| 2.37 | 100,000.00 | fees MGO & others (80% DKH, 20% HHW) | (100,000.00) | | 100,000.00 | | | $ (80,000.00) | $ (20,000.00) | |

| | | Totals | (52,494.32) | 365.00 | 212,591.90 | 365.00 | (5,626.00) | $ (146,505.57) | $ (30,829.45) | $ 16,507.44 |

| | | Summary | Trust | Carl Schreiber | Allan Schreiber | Minor Children | Voided | DKH | HHW | QH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Trust Balance 12-5-17 | 56,286.42 | | | | | $ (146,505.57) | $ (30,829.45) | $ 16,507.44 |
| | | Reimbursement by DKH | 146,505.57 | | | | | $ (146,505.57) | | |
| | | Reimbursement by HHW | 30,829.45 | | | | | | | |
| | | Disbursement to QH | 16,507.44 | | | | | | | |
| | | Disbursement to Carl | (365.00) | 365.00 | | | | | | |
| | | Disbursement to Allan | (212,591.90) | | 212,591.90 | | | | | |
| | | Disbursement to Minor Children | (365.00) | | | 365.00 | | | | |
| | | Trust Closeout to/from Carl | (1,264.03) | 1,264.03 | | | | | | |
| | | Trust Closeout to/from Allan | (1,264.04) | | 1,264.04 | | | | | |
| | | Trust Closeout to/from Minor Children | (1,264.03) | | | 1,264.03 | | | | |
| | | Balance | (0.00) | 1,629.03 | 213,855.94 | 1,629.03 | | $ (146,505.57) | $ (30,829.45) | $ 16,507.44 |

| 1.A.1 | 5,655.00 | total charges for DKH audit | | | | | | | | |
| 1.A.3-1 | TBD | Interest owed to trust on overpaid fees | TBD add | | | | | | | |
| 1.A.5 | TBD | service charges un-disputed charges for DKH audit | | | | | | | | |
| 1.A.9 | TBD | disputed charges for QH audit | | | | | | | | |
| 1.A.9-1 | TBD | service charges for QH audit | | | | | | | | |
| 1.A.9-2 | TBD | | | | | | | | | |
| 1.A.10 | TBD | arbitration fees Part A | TBD ded | | | | | | | |
| 1.B.11 | 33,984.00 | disputed charges for DKH QH audit assessed to HHW ($4591+$15495) | TBD ded | | TBD add | | | TBD ded | TBD ded | |
| 1.B.12 | 13,984.00 | disputed charges for DKH QH MN Dept of Ag assessed to HHW ($4591+$15495) | TBD ded | | TBD add | | | TBD ded | TBD ded | |
| 1.B.13 | TBD | arbitration fees Part B | | | | | | | | |
| 1.B.13-1 | TBD | | | | | | | TBD add | | |
| 1.C.14 | 33,984.00 | disputed charges for QH audit re qpd malpractice ($4391+$15495) | TBD ded | | TBD ded | | | TBD ded | | |
| 1.C.15 | 14,875.50 | disputed charges for QH mediated settlement re QPD malpractice | TBD ded | | TBD ded | | | TBD ded | | TBD ded |
| 2.17-2 | TBD | recovery of damages by Allan (one third) | (6,628.00) | | 6,628.00 | | | TBD ded | | |
| 2.17-3 | TBD | recovery of damages by Allan, MGO legal fees malpractice claims | | | TBD ded | | | TBD ded | | |
| 2.17-3 | TBD | recovery of damages by Allan, MGO legal fees for arbitration of malpractice | | | TBD ded | | | TBD ded | | |
| 2.18 | TBD | arbitration fees Part 2 | | | | | | | | |
| 3.21 | TBD | arbitration fees Part 3 | | | | | | TBD ded | | |
| 3.22 | TBD | | TBD ded | | TBD ded | | | TBD ded | | |
| 4.24 | 29,769.00 | Recovery of damages from Carl's share of legal fees (80% DKH, 20% HHW) | | | | | | $ (23,815.20) | $ (5,953.80) | |
| 4.26 | TBD | unspecified damages by allan re mediated settlement | TBD ded | | TBD add | | | TBD ded | TBD ded | |
| 5.8.27 | TBD | indemnification from damages breach | | | | | | | | |
| 5.8.28 | TBD | indemnification from damages breach | | | | | | | | |
| 5.6.30 | TBD | recovery of damages by Allan | TBD ded | | | | | | | |
| 5.6.31 | TBD | recovery of damages collection of assets by Allan | TBD ded | | | | | | | |
| 5.6.32 | TBD | | TBD ded | | | | | | | |
| 5.6.33 | TBD | recovery of any damage related to all accounting malpractice (eg. Well) | | | | | | | | |
| 5.6.34 | TBD | recovery of any damage related to breach | | | | | | | | |

EXHIBIT H (re-filed)

**Christopher Wittich**
Senior Tax Manager, Boyum & Barenscheer PLLP
Qualifications, Background and Experience
cwittich@boybarcpa.com
952-858-5556

The following is a fairly detailed chronology of my education, work background, charitable activity and capsulated work experience:

## Education and Professional Degrees

**2006**-Accounting Bachelor of Science in Business – University of Minnesota
**2008**-Master of Business Taxation – University of Minnesota
**2011**-Certified Public Accountant-CPA in the state of Minnesota

## Career Chronology

**2006** – Boulay Group, tax intern. Prepared tax returns for individual clients.

**2007- Current** – Boyum & Barenscheer, Senior Tax Manager. Leader of the international tax section. Helping individual and business clients with estate tax planning, tax compliance, income tax planning, and retirement planning.

I have been very involved in the AICPA and the MNCPA organizations. In 2014 graduated from the AICPA Leadership Academy. Will be a speaker at the 2018 AICPA EDGE conference. In 2015 was selected as the MNCPA Young Professional of the Year and chaired the committee for the 2015 MNCPA Tax Conference.

Served on the Board for the Twin Cities Ultimate League since 2014 and helped them obtain nonprofit status in 2016. I have volunteered with Prepare+Prosper for the past 17 years preparing and reviewing tax returns for low income individuals and helping to train the other volunteers. In 2012 I was selected as the Prepare+Prosper reviewer of the year.

In 2005 and 2006 founded and operated a VITA site for students through the undergraduate student government at the University of Minnesota. Also volunteered at a different on campus VITA site specifically for nonresident students in 2005 and 2006.

1

EXHIBIT 3



I have analyzed the situation for the Estate of John Schreier and I have prepared this report summarizing my opinions.

CPAs are trusted advisors and tax experts who help clients with tax situations by providing counsel. I believe the tax advisors including "DKH" erred in their professional duties by not discussing the M706Q deduction with the executors of the Estate of John Schreier and then again by not discussing the clarification in the law which occurred prior to the extended due date of the estate tax return. The M706Q is the only tax deduction specific to the Minnesota estate tax return and it is effective for deaths after June 30, 2011. The law which created the M706Q deduction was a very important one for Minnesota estate tax practitioners and was the first substantive change to Minnesota estate tax law in many years. Estate tax advisors who file Minnesota estate tax returns had a duty to be aware of the law, understand the law, and inform clients of its applicability to client situations.

The heart of the estate tax issue centers around the M706Q deduction on the Minnesota estate tax return and whether John Schreier's Estate qualified to claim the deduction. For deaths occurring after June 30th, 2011 Minnesota allowed for a Form M706Q which is a deduction for Qualified Small Business or Qualified Farm Property. When John Schreier died April 17th 2012, the M706Q deduction for Qualified Farm Property was available.

Upon the first passing of the bill, it was clear in the Minnesota estate tax community that one area of confusion and contention would be the use of revocable trusts which are ignored for tax purposes and are very commonly used for estate planning and estate management. The original statute passed by the legislature (291.03) provided the definition of Qualified Farm Property for the purposes of the M706Q deduction. The original statute was this:

*Subd. 10. Qualified farm property. Property satisfying all of the following requirements is qualified farm property:*
*(1) The value of the property was included in the federal adjusted taxable estate.*
*(2) The property consists of a farm meeting the requirements of section 500.24, and was classified for property tax purposes as the homestead of the decedent or the decedent's spouse or both under section 273.124, and as class 2a property under section 273.13, subdivision 23.*
*(3) The decedent continuously owned the property for the three-year period ending on the date of death of the decedent.*
*(4) A family member continuously uses the property in the operation of the trade or business for three years following the date of death of the decedent.*
*(5) The estate and the qualified heir elect to treat the property as qualified farm property and agree, in a form prescribed by the commissioner, to pay the recapture tax under subdivision 11, if applicable.*

There are five requirements in the statute. For John Schreier's estate the first requirement is met by looking at the federal estate tax return, the property is included in John's federal adjusted taxable estate. Third requirement is met because revocable trusts are ignored for tax purposes and the assets inside of a revocable trust are treated as owned by the grantor of the trust. Fourth requirement was going to be met as the property was kept in the family and it was the operation of a trade or business. The fifth requirement could be met by making the election on the M706Q. The key test is the second

EXHIBIT H (re-filed)

requirement, which refers to meeting the requirements of Section 500.24 and being classified properly for property tax purposes.

Section 500.24 is a lengthy section about farming by business organizations and provides a definition of a family farm trust. The definition of family farm trust is the key to determining whether or not farm land owned by a revocable trust could qualify under the second requirement for being Qualified Farm Property.

*Section 500.24 Subd. 2 (d) "Family farm trust" means:*
*(1) A trust in which:*
*(i)     A majority of the current beneficiaries are persons or spouses of persons who are related to each other within the third degree of kindred according to the rules of civil law;*
*(ii)    All of the current beneficiaries are natural persons or nonprofit corporations or trusts described in the Internal Revenue Code, section 170(c), as amended, and the regulations under that section; and*
*(iii)   One of the family member current beneficiaries is residing on or actively operating the farm; or the trust leases the agricultural land to a family farm unit, a family farm corporation, an authorized farm corporation, an authorized livestock farm corporation, a family farm limited liability company, a family farm trust, an authorized farm liability company, a family farm partnership, or an authorized farm partnership; or*
*(2) A charitable remainder trust as defined in the Internal Revenue Code, section 664, as amended, and the regulations under that section, and a charitable lead trust as set forth in the Internal Revenue Code, section 170(f), and the regulations under that section.*

Based on reading that original statute, it is not perfectly clear if farm land that is owned in a revocable trust can be qualified for the M706Q. The statute (291.03) references individuals owning the property, but makes no specific mention of revocable trusts. The proper course of action as a tax and estate advisor is to discuss the issue with the client and explain that the revocable trust is not specifically excluded, but it is not specifically allowed either and the state of Minnesota had provided no specific guidance on the issue. Based on the spirit of the law, which is giving an estate tax break to individuals who own farm property or small businesses, and the general principle that revocable trusts are ignored for tax purposes, and the fact that it wasn't excluded as part of the original statute, I think a client would have been entitled to claim the M706Q deduction based on the original statute. The standard of care in this situation is to discuss the situation with the client and assist the client in making an informed decision, and to my knowledge that didn't take place.

Since the M706Q deduction was created I have discussed the M706Q deduction with every client filing a Minnesota estate tax return where the assets included any type of farm property or small business. Each situation is unique, but we have had several clients claim either the M706Q Qualified Farm Property deduction or the Qualified Small Business deduction.

The Minnesota estate law was clarified on May 21, 2013 with a bill passed through the legislature which specifically addressed whether farm land owned through trusts could qualify for the M706Q deduction. The new law changed requirement two to state:

*Subd. 10. Qualified farm property.*
*(2) The property consists of agricultural land and is owned by a person or entity that is either not subject to or is in compliance with M.S. 500.24.*



Boyum ◆ Barenscheer PLLP
CERTIFIED PUBLIC ACCOUNTANTS AND ADVISERS

EXHIBIT H (re-filed)

Furthermore, the guidelines regarding qualified heirs were modified to include "a trust whose present beneficiaries are all family members". The clarification offered by the May 21, 2013 bill make it clear that the use of revocable trusts was allowed when claiming the M706Q deduction for Qualified Farm Property. It is the duty of Minnesota estate tax advisors to stay up to date on clarifications to the Minnesota estate tax laws.

This clarification to the law occurred prior to the extended filing due date of the John Schreier estate, which was due July 17, 2013. The estate return was filed on April 15, 2013, about 3 months prior to the extended deadline. Given the pending estate tax legislation, it was a mistake to file the estate tax return more than 3 months prior to the extended deadline. Waiting to see how clarifications to the Minnesota estate tax law would impact the John Schreier situation was the prudent thing to do. After the bill was passed, the prudent thing to do would be going back to recently filed estate tax returns and see if the clarification impacted the decision to claim the M706Q deduction.

In late May 2013, it was clear that the John Schreier estate would have been entitled to claim the M706Q deduction and, since the return was filed in April 2013, an amended return could have been prepared as soon as the law became clear, but to my knowledge it was not addressed with the client by the tax advisors at that time.

The failure to claim the M706Q deduction on John Schreier's estate tax return prior to the extended due date of July 17, 2013 directly led to the incorrect treatment and filing of Ann Schreier's estate return in 2015 after her death on February 17, 2014. The federal Form 706 showing that assets passed through John Schreier's estate with a marital trust was incorrect based on a failure to claim the M706Q deduction. Assets were allocated to the marital trust instead of the credit trust, which caused 2012, 2013, 2014 marital trust returns to be prepared and filed and then later amended once the M706Q deduction was properly claimed. The failure to claim the M706Q deduction on the original return was also the cause of future legal and professional fees to get the whole situation amended and straightened out, which eventually resulted in zero estate tax being due for both the estates of John and Ann Schreier.

When assets are incorrectly transferred into a marital trust instead of a credit trust it changes the assets that are included in Ann's estate return and it impacted the ability of Ann's estate to claim the M706Q deduction. By claiming the M706Q deduction incorrectly on property that Ann held for less than 3 years, the tax advisors opened the estate up to a challenge from the Minnesota Department of Revenue. The challenge from the Minnesota Department of Revenue was eventually resolved favorably with an amended estate tax return for John and an amended estate tax return for Ann and a waiver from the Department of Agriculture. All of the amended returns and professional fees related to those filings were necessary because John's estate tax return was filed incorrectly by not claiming the M706Q deduction.

*Christopher Wittich*

Christopher Wittich, MBT, CPA

Boyum ◆ Barenscheer PLLP
CERTIFIED PUBLIC ACCOUNTANTS AND ADVISERS

EXHIBIT H (re-filed)

# STEVEN J. FRANTA

Steven J. Franta is the senior managing attorney and owner of the law firm The Legal Professionals™PA, Somsen, Mueller & Franta PA. The firm's principal office is in New Ulm, Minnesota. He has over twenty five years of experience practicing law primarily focusing in the areas of estate planning, probate, real estate, agricultural and land business law. He is also a licensed Title Insurance Agent and Certified Continuing Education Coordinator and Presenter.

History: Prior to joining The Legal Professionals ™PA, he worked as a law clerk and associate attorney from 1990-1994 for MacKenzie B. Gustafson in St. Peter and as Nicollet County Assistant County Attorney. In 1994 Steve joined the firm of Somsen, Schade, and Schaffer, acquired ownership of the firm in 1997 which has since expanded to include the practices of Alvin R. Mueller (New Ulm) in 2003, Sheldon S. Larson (Winthrop) in 2008, William D. Sommerness (Hutchinson) in 2013, and Errol E. Hauser and Donald E. Schmid (Sleepy Eye) in 2014.

Education: B.S. in Social Science with a concentration in Economics, St. John's University and Mankato State University; Juris Doctor, Hamline University School of Law 1992. He has completed numerous intermediate and advanced course work including:

Estates, Trusts, Will and Probate: Elder Law Annual Institute(s), Probate & Trust Law Annual Institute(s), Estate Planning Practicums I, II, III (re: FLP, IDIGT, QPRT, PRI, ILIT, GRAT, CLT, CRT, Private Annuities, Foundations, SCIN), Estate Planning Collegiums (5), Drafting Wills and Trusts, Income Tax for Estate Planners I, II, III, Supplemental and Special Needs Trusts, Medical Assistance, Charitable Giving as an Integral Part of Estate Planning, Minnesota Planned Giving Conference, Estate & Charitable Gift Planning Institutes, Estate Planning with Retirement Benefits Advanced, Trust Settlement, Family Limited Partnership, Transfer Planning & Trustee Powers, Marital Deduction, Disclaimers, Advanced Estate Planning Lecture Series, Advanced Studies Program, Teton Institute, Wealth Counsel 2009, 2010 and 2012 Planning for Generations Conferences.

Business and Agriculture: Farm & Ranch Estate & Business Planning, Agriculture & Rural Law Institute(s), Business Law Institute(s), Advance Business Planning Series, Business Sales & Acquisitions, Buy/Sell Agreements, Asset & Stock Purchase Agreements, Purchase and Sale of a Business, Family Limited Partnerships and Limited Liability Companies, Planning for Ownership Succession in the Family Business.

Real Estate: Real Estate Annual Institute(s), 1031 Exchanges.

Admitted: State Court of Minnesota, United States District Court-District of Minnesota.

Memberships and Community Involvement: Steve is a member and chair of The Southern Minnesota Estate Planning Council (SMEC), Minnesota State Bar Association, Wealth Counsel and Advisors Forum.

EXHIBIT 4

He has held positions as President and board member of the New Ulm Area Foundation, Church Trustee, Administrative Council and Area Faith Administrative Council, New Ulm Chamber of Commerce Director; Chairman of the Board of Directors of Oak Hills Living Center Foundation; Chairman of the Board of the Oak Hills Living Center Operations, Chairman of the Parents Advisory Council.

**TLP**

## *The* **Legal Professionals**™ PA

*Attorneys at Law since 1896*

106 ½ N Minnesota Street
PO Box 38
New Ulm MN 56073
Telephone: (507) 354-2161
Fax: (507) 354-2161

November 28, 2017

Mark Ohnstad
DeWitt Mackall Crounse & Moore S.C.
1400 AT&T Tower
901 Marquette Avenue
Minneapolis, MN 54023

Re: Schreier Opinion Report

Dear Mr. Onstad:

My analysis and opinion of the John J. Schreier estate tax return standard of practice, and the standard of care, and the duty, its breach, causation and damages is provided herein.

The following timeline/chronology is presented for reference:

| | |
|---|---|
| 7-1-2011 | New Minnesota Statutes Sec 291.03, Subd 1 and Subd 8-11, effective date (qualified farm property deduction) |
| 4-17-2012 | John J. Schreier date of death |
| 5-14-2012 | Governor vetoes legislation to include entities |
| 6-4-2012 | Minnesota State Bar Association Probate and Trust Institute |
| 4-15-2013 | 706 filed without the election for the qualified farm property deduction for John J. Schreier estate and claiming a marital deduction for property funded to a Marital Trust taxable on his surviving spouse's estate. |
| 5-23-2013 | Amendment to 291.03 signed by governor retroactive for decedent's dying after 6-30-11 (clarifying trust owned farm property included) |
| 6-10-2013 | Minnesota State Bar Association Probate and Trust Institute |
| 7-17-2013 | 706 estate tax return due date (with 6 month extension) |
| 12-21-2015 | Amended 706 estate tax return filed with the election for the qualified farm property deduction for John J. Schreier estate and eliminating the use of the marital deduction and funding of the Marital Trust retroactive and thus not taxable in surviving spouse's estate the result of which is the total elimination of any estate tax on either estate. |

———————————— thelegalprofessionals.com ————————————

| **New Ulm** | **Hutchinson** | **Sleepy Eye** | **Mankato** | **Duluth** |
|---|---|---|---|---|
| 106½ N Minnesota St | 205 Jefferson St SE Ste 2 | 109 Main St W | 500 S Broad St | (By Appointment Only) |
| New Ulm, MN 56073 | Hutchinson, MN 55350 | Sleepy Eye MN 56085 | Mankato MN 56001 | Duluth, MN 55811 |
| 507-354-2161 | 320-234-6262 | 507-794-3671 | 507-779-7153 | 320-266-7331 |

EXHIBIT H (re-filed)

November 28, 2017
Page 2

In 2011 the Minnesota legislation added a new qualified farm property deduction to the Minnesota estate tax statutes to reduce the value of the estate that will be taxed. The enactment effectively raised the Minnesota estate tax exemption amount to $5,000,000 for decedent's estates with qualified farm property.

One requirement to qualify for the deduction was that the farm property had to have been owned by decedent continuously for 3 years prior to the date of death. Another requirement to qualify for the deduction was that the farm property consist of a farm meeting the requirements of Minn. Stat. Section 500.24 and is classified as "homestead of the decedent. . . ."  The statute was in some manner and form based upon and in some respects followed Section 2032A of the Internal Revenue Code. 2032A had been in effect for quite some time and specifically allows for farm property held by entities (including trusts see  C.F.R. Section 20.2032A-3 (d) Internal Revenue Code) to qualify for the 2032A.

The farm property owned by John J. Schreier Revocable Living Trust prior to his death met the requirements of Section 500.24 Subd. 2(d)(1) and was classified as homestead.

The estate and trust legal community and lawyer practitioners in the second half of 2011 became well aware of one particular issue in the provisions of the 2011 legislation and were searching for guidance as to whether entity owned, including trust held, farm property would qualify for the qualified farm property deduction. In the first six months of 2012 practitioners were, and should have been, following the 2012 Minnesota legislative session looking and hoping for clarification. The 2012 legislation that passed both the Minnesota House and the Senate would have made technical corrections to the qualified farm property provisions. Specifically, it would have added to Section 291.03, Subd 8 that a trust whose present beneficiaries are all family members to be included in the definition of "family member."  Also, it would have added to 291.03 Subd. 10 that a decedent's ownership in qualified farm property would, in addition to outright ownership include ownership, by the decedent as deemed under Sections 2036 2037 and 2038 (includes revocable living trust) of the Internal Revenue Code.

One June 4 and 5, 2012, the Minnesota State Bar Association held it's 38th annual Probate and Trust Law Section Conference. This is the premier and one of many continuing education opportunities for obtaining updated information on estates, trusts and estate taxes including the laws proposed, heard, but not enacted in the 2012 legislative session. The topic of the bill referenced in the preceding paragraph was covered in great detail and the materials therefrom are extensive. The

EXHIBIT H (re-filed)

November 28, 2017
Page 3

conference is usually attended by 550-650 attorneys who practice in Minnesota in the areas of wills, trusts and estate taxes. This information is repeated or shared by attorneys and accountants and at additional CLE and/or attorney events the following months.

The 2012 law was vetoed by the governor (but subsequently very similar provisions were enacted and became law in 2013.) In the first six months of 2013 practitioners were again watching (in some instances actively lobbying) and were looking to the legislative session to enact a bill that did in fact amend section 291.03 Subd. 10 to add that farm property owned by a person or entity may claim the qualified farm property deduction. This hoped for clarification legislation became law and was signed by the Governor on May 23, 2013 and was effective retroactively for estates of decedent's dying after June 30, 2011.

One June 10 and 11, 2013, the Minnesota State Bar Association held it's 39th annual Probate and Trust Law Section conference. The premier and one of many continuing education opportunities for obtaining 2013 legislative session amendments, including amendments to Minnesota Statutes 291.03. These amendments were covered in detail.

It is my opinion that the standard of care for a lawyer practitioner for the years 2011 through 2013 was to have been informed of and to have keenly watched the legislation on this matter and particularly when involved in a case advising the fiduciary and the fiduciary's tax preparer for an estate tax that was not due until July 17, 2013 as was in fact the circumstances of this matter of the estate of John J. Schreier. The standard of care requires the lawyer to have waited for the end of the legislative session and would not have filed an estate tax return before its due date in July without understanding and advising the fiduciaries and tax preparers of the pending legislation. The standard of care for an attorney advising an estate in the preparation of a 706 Estate Tax Return whether they are preparing it themselves or whether an accounting firm is engaged to prepare the return is to advise the fiduciaries and the tax preparers that the return not be filed without having considered specifically in this instance the qualified farm property deduction. In this case the election for the qualified farm property deduction should have been considered, reviewed, advised and made after the May 2013 law was passed.

The attorney who advised, counseled and collaborated with the fiduciaries and tax preparers of the estate who did not discuss or consider the 2013 pending legislation nor the actual law that passed and was enacted on May 23, 2013 did not meet the standard of practice or the standard of care and breached the duty of care. In that capacity the standard of care and duty is that he should have advised the tax preparers and the fiduciaries of the estate that they explore and discuss the

November 28, 2017
Page 4

alternatives and wait for the 2013 clarifications and alternatives to materialize or fail. A failure to do this is substandard and in breach of the duty to be fully aware, up to date, and to advise and counsel relative to it. The standard of practice and duty is to review the 706 return to specifically determine if the qualified farm property deduction election is properly made. The standard of care and duty requires that either the 706 should not have been prepared and filed without the election for the qualified farm property deduction; or in this instance that the 706 having been filed prior to the outcome of the pending legislation, i.e. May 23, 2013 that the 706 filed in April of 2013 should have been amended to make the election prior to funding the Marital Trust.

The failure to claim the deduction on the 706 or the failure to amend and claim the deduction led to a series of otherwise unnecessary analysis, work, filings, amendments, appeals, and litigation that would not have been required had the election been made on the 706 in 2013. Consequently, the standard of care having not been followed and the duty breached directly caused damages to the extent of additional professional fees incurred to follow up and amend and fix what should have been the standard to file the 706 claiming the deduction after the close of the legislative session in 2013, i.e. after the May 23, 2013 and before July 17, 2013.

Had the standard of care been followed the following damages would not have had to have been incurred (but for the breach of the standard):

1. The expenses and fees incurred and paid for the professional services which did not meet the standard of care should be refunded. These services provided no value and in fact caused a negative value in the form of damage caused and incurred therefrom.

2. Expenses and fees incurred related to the administration of the Marital Trust created under the John J. Schreier Trust including:
   a. Attorney fees;
   b. 1041 income tax preparation fees for 2012, 2013 and 2014 and amendments;
   c. Advice and counsel to the interested parties of the Marital Trust to attend to and deal with all matters and actions and issues having arisen that would not have been at issue had a Marital Trust never been formed including all costs of all disputes and litigation between the interested parties and/or their legal counsel, accountants, advisers and other parties.

November 28, 2017
Page 5

3. Expenses and fees incurred to undo and fix the error including all accountant and attorney fees and interested parties' costs related to:
   a. research a fix;
   b. negotiate and lobby for the fix;
   c. amend 706 to fix
   d. obtaining through litigation or otherwise accountability and damages for losses resulting from the breach of the standard of care; and
   e. litigation and arbitration expenses and fees.

4. Interest and service charges on expenses and fees paid and/or incurred.


Steven J. Franta

SJF:pak