UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 18-2310 (DSD/KMM)

Allan M. Schreier, individually, as
beneficiary and Co-Trustee of the
John J. Schreier Revocable
Intervivos Trust and of the Ann
Barbara Schreier Revocable
Intervivos Trust, and as Co-Personal
Representative of the Ann Barbara
Schreier Estate,

        Plaintiff/Counter-Defendant.

v.                                            **ORDER**

Drealan Kvilhaug Hoefker & Co. P.A.,
and Hedeen Hughes and Wetering,

        Defendants/Counter-Claimants.


    Mark G. Ohnstad, Esq. and DeWitt, LLP, 2100 AT&T Tower, 901
    Marquette Ave., Minneapolis, MN 55402 counsel for plaintiff.

    Mark A. Bloomquist, Esq., Laura E. Kuipers, Esq. and Meagher
    & Geer, P.L.L.P, 33 South Sixth Street, Suite 4400,
    Minneapolis, MN 55402, counsel for defendant Drealan Kvilhaug
    Hoefker & Co. P.A.

    Christopher R. Morris, Esq. and Bassford Remele, 100 South
    Fifth Street, Suite 1500, Minneapolis, MN 55402, counsel for
    defendant Hedeen Hughes and Wetering.


    This matter is before the court upon the motions for summary

judgment by defendants Hedeen, Hughes & Wetering and Drealan

Kvilhaug Hoefker & Co. P.A. and the motion for partial summary

judgment by plaintiff Allan M. Schreier, individually, as

beneficiary and co-trustee of the John J. Schreier Revocable

Intervivos Trust and of the Ann Barbara Schreier Revocable Intervivos Trust, and as co-personal representative of the Ann Barbara Schreier Estate. After a review of the file, record, and proceedings herein, and for the following reasons, the court grants defendants' motions and denies plaintiff's motion.

## BACKGROUND

This legal and accounting malpractice case arises out of a complicated and contentious family dispute. The record submitted to the court is extensive and the court will only discuss those facts necessary to resolve the instant motions.

### I. The Family

John and Barbara Schreier, who are now deceased, owned and operated a 700-acre farm in Murray County, Minnesota. They had three children – Allan, Carl, and Paul Schreier. Carl remained on the family farm where he worked and took care of John and Barbara. Allan is an engineer in South Dakota. Paul died before the contested matter arose, and Paul's wife Michelle continued to work on the farm thereafter. Carl and Paul (and later Michelle) paid rent to John and Barbara for their use of the farmland while John and Barbara were still alive. See Kuipers Decl. Ex. 28. The rental rate was $150 per acre. See id.

## II. **The Trusts**

1n 1992, John and Barbara placed the 700 acres of farmland into two trusts: the John J. Schreier Revocable Intervivos Trust and of the Ann Barbara Schreier Revocable Intervivos Trust (Trusts). <u>See</u> Kuipers Second Decl. Ex. 44; Ohnstad Decl. Ex. 5. John and Barbara retained defendant Hedeen, Hughes & Wetering (HHW), a law firm based in Worthington, Minnesota, to prepare the trust documents. Wetering Aff. ¶ 4. HHW continued to do estate planning work for John and Barbara thereafter, including preparing various amendments to the Trusts. <u>See, e.g.</u>, Ohnstad Decl. Exs. 8, 11, 12, 24, 26-27, 34-35, 48, 123, 129. In 2009, the family met at HHW to discuss the contents of the Trusts for the first time. A. Schreier Dep. 38:1-23. After the meeting, Allan, Paul, and Carl retained another law firm to review the Trusts to ensure that they were well suited to meet the family's needs. <u>Id.</u> 38:23-39:4. The law firm confirmed that the Trusts were appropriate and, according to Allan, could not be improved. <u>Id.</u> 39:4-12.

John died in 2012 and Allan and Carl assumed their roles as co-Trustees of the John Schreier Trust, for which Barbara was the beneficiary. Ohnstad Decl. Ex. 3, Art. XII. Barbara was the designated personal representative for John's estate. <u>Id.</u> Ex. 2, Art. VII; Penning Dep. 19:8-12. Barbara died in 2014 and Allan

and Carl were appointed as co-trustees of her Trust, as well as personal representatives of her estate.  Id. Ex. 5, Art. XII; id. Ex. 4, Art. VII.  Allan, Carl, and other members of the Schreier family were beneficiaries of the Trusts.

### III. John's Estate Taxes

Certified public accountant Cindy Penning of defendant Drealan Kvilhaug Hoefker & Co. P.A. (DKH) worked on the estate tax return after John's death.  The return was due January 17, 2013, nine months after John died.  Penning secured an extension and filed the return on January 30, 2013.  Penning Dep. 8:18-20, 138:21-23; Kuipers Decl. Ex. 2; Ohnstad Decl. Ex. 75.  Barbara signed the returns as personal representative on February 8, 2013. Penning Dep. 6:15-7:18.  In preparing the return, Penning communicated with Bill Wetering of HHW, which drafted the Trusts, to confirm certain aspects of John's Trust.  Kuipers Decl. Ex. 26; Ohnstad Decl. Exs. 65, 88.  There is no indication that Wetering or any other HHW attorney provided legal advice relating to the tax return.

Penning did not declare what is referred to as a "Q deduction"[1]

---

[1] Under certain circumstances, a Q deduction allows the estate of a deceased farmer to deduct the value of homestead farmland from the total value of the estate, which reduces the total tax liability for the estate.  See Minn. Stat. § 291.03.

on John's estate return because she did not believe it was applicable under the circumstances. Penning Dep. 12:14-23. Penning discussed the estate return with Barbara but cannot recall if she mentioned the Q deduction. <u>Id.</u> 18:25-20:1. Barbara specifically instructed Penning not to discuss the return with Allan, who was co-trustee of the estate, because Allan was mid-divorce at the time. <u>Id.</u> 123:5-24:9.

## IV.  **Rental Rate Dispute**

At some point, Allan became concerned that his siblings were not paying enough rent to his parents for the farmland they were operating.  In 2010, Allan took Barbara to meet Penning at DKH to discuss the rent and his parents' living expenses.  A. Schreier Dep. 40:21-43:14.  The details of the meeting are not clear from the record, but it does not appear that it prompted an adjustment in the rental rate.

In February 2012, Barbara asked Penning for advice as to whether the $150 rental rate was unreasonably low.  Penning Dep. 64:23-65:12; Kuipers Decl. Ex. 5.  This inquiry appears to have been triggered by Allan's complaints to Barbara that Carl and Michelle were "getting a good deal" at his expense.  <u>See</u> Kuipers Decl. Ex. 5.  Barbara told Penning that she wanted to be fair to Allan, but also to "do right" by Carl and Michelle who were farming

the land.  Id.  Penning provided Barbara with a report from the
University of Minnesota showing the average rental rates for
farmland by county between 2006 and 2010.  Penning Dep. 65:15-
67:2; Kuipers Decl. Ex. 6.  The report shows that the median cash
rent in Murray County in 2010 was $150 per acre.[2]  Kuipers Dec.
Ex. 6, at 3.  Penning believed that the Schreier rental rate was
"between the low and the high" rates reflected on the report and
told Barbara that she believed the rental rate was reasonable.
Penning Dep. 67:3-8, 68:21-69:6.  It does not appear that Barbara
adjusted the rental rate after receiving this information.

Then, in April 2013, Penning responded to Allan's email to
her asking questions on various topics.  Kuipers Decl. Ex. 3.
Among other things, Penning confirmed that Carl and Michelle had
historically paid rent in the amount of $150 per acre, as set by
John and Barbara.  Id.  Penning said that future rent would be set
by Allan and Carl as co-trustees and recommended that the rental
agreement be put in writing.  Id.  Penning did not opine as to
what the rent amount should be.  See id.; see also Kuipers Decl.
Ex. 4 (describing accounting services provided by DKH that did not
include estimating rental value for land).

---

[2] The data included both family and third-party land rental
contracts.  Kuipers Decl. Ex. 6, at 4.

## V.    Allan's Estate Concerns

In April 2013, Allan emailed Bill Wetering of HHW to share concerns about Carl's administration of John's Trust and to request a meeting.[3]  Kuipers Third Decl. Ex. 47, at 1.   There is no indication in the record that Wetering responded substantively or that they met to discuss Allan's concerns.   Although Wetering acknowledges that HHW drafted the Trusts, he denies that Allan ever retained him or HHW to represent Allan personally in matters relating to the Trusts or in his disputes with Carl.   Wetering Aff. ¶ 5.  Allan sent Wetering another email on February 6, 2014, setting forth additional concerns with respect to Carl and his handling of John's Trust.   Kuipers Third Decl. Ex. 47, at 2-3.   In that email, Allan refers to Wetering as "the trust's attorney" rather than his personal attorney.   Id. at 3.   He did not ask Wetering to do any work on behalf of the Trusts, however.   See id.

Soon after Barbara died, Allan and Carl's relationship deteriorated over administration of the estates and the rental rate for the farmland.   See, e.g., Ohnstad Decl. Exs. 140, 142, 144.   Allan retained attorney Paul Stoneberg to represent him in matters relating to the Trusts, including the rental rate issue.

---

[3] Allan and Wetering attended college together at South Dakota State and were fraternity brothers.  Wetering Aff. ¶ 3.

See Kuipers Third Decl. Ex. 47, at 8-9; Wetering Aff. ¶ 5; Ohnstad Decl. Exs. 145-46, 162.

Allan believed that, among other things, Carl was self-dealing by setting his rents at an unreasonably low rate and thus harming the beneficiaries of the Trusts. Kuipers Third Decl. Ex. 47, at 8-9. Allan told Stoneberg that Wetering had opined that Carl was self-dealing to the detriment of the Trusts. Id. at 8-10. Stoneberg responded that the self-dealing argument could be viable if Carl had been the trustee when the rate was established, but not if Barbara set the rate when alive and competent to do so. Ohnstad Decl. Ex. 146.

## VI. Barbara's Estate Taxes

Penning filed the tax return for Barbara's estate on May 14, 2015. Penning determined that the previously inapplicable Q deduction applied to Barbara's estate return due to a change in the law after she filed John's estate return. See Kuipers Decl. Ex. 24. The Minnesota Department of Revenue initially disagreed but later reversed its decision and allowed Barbara's estate to claim the deduction, which resulted in no tax liability for the estate. See id. Exs. 15-18. Penning had to file amended tax returns in order to claim the deduction. See id. Ex. 18. Penning worked with Allan's lawyer, Brad Hanson of Quinlivan & Hughes, to

secure the deduction.  _See id._ Exs. 13, 23, 27.

## VII. State Court Disputes

After Barbara died, Allan sued Carl for breach of a promissory note in Lyon County.  Kuipers Decl. Ex. 7.  In a separate action filed in Murray County, Allan sued Carl and Michelle alleging that the rental rate was substantially less than fair market value, which reduced the value of the Trusts.  _Id._ Ex. 8.  In February 2015, Allan, Carl, and Michelle settled part of their dispute in mediation.  _Id._ Ex. 12.  The settlement agreement included a mutual release binding the parties, their heirs, successors, and assigns, relating to "any and all claims" arising out of the Trusts.  _Id._ ¶ 20.  They continued to have issues, however, and eventually went to arbitration where they resolved some of their legal claims.  _See_ Kuipers Decl. Ex. 13, at 10; _id._ Ex. 14.

## VIII. This Action

Allan commenced this action against DKH and HHW in Nobles County conciliation court, alleging malpractice and professional negligence claims.  _See_ Kuipers Decl. Ex. 19.  He specifically alleged that DKH engaged in accounting malpractice by failing to claim the Q deduction on the tax return for John's estate and that HHW engaged in legal malpractice by providing faulty advice to DKH relating to that tax return.  _Id._ at 3.  On May 15, 2017, the

conciliation court entered judgment in favor of DKH and HHW, finding that Allan had failed to establish that they acted below professional standards of care. Id. at 5. The court specifically noted the lack of expert testimony supporting Allan's claim. Id. Allan appealed, removed the case to the Nobles County district court, and filed an amended complaint. Kuipers Decl. Ex. 20; ECF No. 1-4. He later filed a second amended complaint adding claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, et seq., and for aiding and abetting Carl in his alleged breaches of fiduciary duty as co-trustee of the Trusts. Second Am. Compl., ECF No. 1-8, ¶¶ 21-32.

On August 7, 2008, DKH and HHW removed the action to this court. ECF No. 1-10. DKH asserted counterclaims for breach of contract, unjust enrichment, quantum meruit, and account stated – all based on Allan's alleged failure to pay DKH for services rendered. DKH Answer and Countercl., ECF No. 11, at 17-20.

Thereafter, Allan filed two motions to alter or supplement his complaint. In the first such motion, the court allowed Allan to file a supplemental complaint to include allegations regarding his recent settlement with Carl and other family members, which resulted in Allan becoming the sole beneficiary and trustee of the Trusts. See ECF No. 38, at 2-3, ECF No. 45; Morris Aff. Ex. 16.

The court denied, however, Allan's request to modify the scheduling order to allow each side to call a third expert witness.  See ECF No. 38, at 3-6; ECF No. 45.  In the second motion, the court denied Allan's request to add claims relating to alleged underpaid rent by Carl and Michelle between 2011 and 2014.[4]  See ECF Nos. 58, 63. Allan now moves for partial summary judgment and DKH and HHW each move for summary judgment.

## DISCUSSION

### I.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

---

[4] The court viewed the proposed supplemental complaint as an effort to obtain a different ruling on the request for an additional expert witness rather than a sincere effort to add new claims or newly discovered facts relevant to the existing claims. ECF No. 58, at 2.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

## II. Legal Malpractice Claim

Allan alleges that Wetering and HHW committed legal malpractice by counseling against applying the Q deduction on John's estate tax return. Although less clear, he also appears to allege that HHW committed malpractice by providing poor advice as to rental rates for the farmland operated by Carl and Michelle.

### A. Expert Affidavits

Minnesota law requires a plaintiff alleging professional malpractice to furnish two affidavits. First, a plaintiff must submit an "affidavit of expert review" with the complaint, stating

that an expert qualified to testify at trial has reviewed the case and that, in the expert's opinion, the defendant deviated from the standard of care, thereby injuring the plaintiff. Minn. Stat. § 544.42, subdiv. 3(a)(1). Second, a plaintiff must submit an expert identification affidavit within 180 days after he commenced the suit. Id. § 544.42, subdivs. 2 & 4. That affidavit must identify the expert witness who will testify and summarize the expert's expected testimony and the grounds for each opinion. Id. § 544.42, subdiv. 4. The second affidavit must specifically "illustrate how and why the alleged malpractice caused the injury" and must "outline the chain of causation between the violation of the standard of care and the plaintiff's damages." Lindberg v. Health Partners, Inc., 599 N.W.2d 572, 577 (Minn. 1999); Maudsley v. Pederson, 676 N.W.2d 8, 14 (Minn. Ct. App. 2004).

HHW argues that dismissal of Allan's claim against it is warranted due to the insufficiency of his expert affidavits.[5] The court agrees.

---

[5] For purposes of this motion, the court will leave aside the contested issue of whether the affidavits were timely submitted.

13

Allan retained Steven Franta as his legal malpractice expert. Franta's first affidavit and attached report is focused solely on application of the Q deduction on the Trusts' tax returns. Ohnstad Decl. Ex. 763, at 6-9. Franta opines that between 2011 and 2013, Minnesota estate and trust lawyers should have been aware of pending legislation relating to the Q deduction and should have advised tax preparers to wait until the end of the legislative session before filing tax returns that could be affected by the legislation. Id. at 6. Relating specifically to this case, Franta opines that election of the Q deduction should have been "considered, reviewed, advised and made after the May 2013 law was passed" and that failure to do so breached the duty of care. Id. He does not specifically discuss Wetering or HHW's role, or lack thereof, in preparing the returns at issue, but instead speaks generally to the standard of care. See id. Indeed, he broadly states that "[t]he attorney who advised, counseled and collaborated with the fiduciaries and tax preparers of the estate who did not discuss or consider the 2013 pending legislation nor the actual law that passed and was enacted on May 23, 2013 did not meet the standard of practice or the standard of care and breached the duty of care." Id. at 7. But he does not establish that Wetering or anyone else at HHW advised, counseled, or collaborated

with the fiduciaries and tax preparers of the estate. Franta also generally opines that the breach of the standard of care caused the Trusts to incur unnecessary legal fees and expenses and additional tax preparation fees that otherwise would have been avoided. Id. at 7-9.

Franta's supplemental report addresses the issue of conflicts of interest in attending to an estate, but again fails to clearly establish that Wetering or anyone else at HHW was responsible for or played any role in the estate tax filing. See Ohnstad Decl. Ex. 764. Indeed, Franta acknowledges that the "record does not disclose clearly who Mr. Wetering represented" and does not directly address Wetering's or HHW's conduct. Id. at 6. "An attorney who is sued for malpractice is entitled to a specific disclosure of the ways in which that attorney is alleged to have breached the standard of care." Afremov v. Sulloway & Hollis, P.L.L.C., 922 F. Supp. 2d 800, 816 (D. Minn. 2013) (emphasis in original). That requirement is utterly lacking here. Moreover, Franta's opinion is vague and so broadly stated as to be meaningless:

> If an attorney participates in, or fails to disclose
> others' participation in, the withholding of
> information or of actions taken or of alternative
> actions that might have been taken or which might
> have been considered to be taken, questions must be
> answered regarding the breach of the standard of

care and the violation of rules of ethics and whether
such a breach and/or violation leads to a
determination of aiding and abetting misconduct.

Id. at 7. Franta's opinion falls woefully short of the specificity
required to establish a duty, a breach of that duty, and damages
caused by that breach. Indeed, he does not even establish that
Wetering or anyone else at HHW provided legal services of any sort
relating to the tax returns at issue. To the extent Allan claims
that HHW committed malpractice in establishing the Trusts in the
first place, his expert provides no support for that contention.
Dismissal of the legal malpractice claim is warranted on this basis
alone.

### B.    Merits

Even if the affidavits were somehow not fatally deficient,
Allan's malpractice claim against HHW fails on the merits. Under
Minnesota law, a plaintiff must establish four elements to prove
legal malpractice: (1) an attorney-client relationship, (2) acts
constituting negligence or breach of contract, (3) that such acts
were the proximate cause of plaintiff's damages, and (4) but for
defendant's conduct, the plaintiff would have obtained a
successful result. Blue Water Corp. v. O'Toole, 336 N.W.2d 279,
281 (Minn. 1983).

First and foremost, and as already noted, Allan has not established that HHW acted as legal counsel with respect to the Trusts' tax returns, which appears to be the basis for his malpractice claim. Although Wetering provided Penning – the tax preparer – with some information relating to the Trusts, the record does not support a finding that he or anyone else at HHW provided or were ever asked to provide legal advice as to the Trusts' tax returns. Allan's own testimony belies his claim:

> Q. Did you ever ask Mr. Wetering for advice concerning preparation of the estate and trust tax returns?
>
> A: I don't think I did.
>
> Q: Did you ever see a bill from Mr. Wetering?
>
> A: No.
>
> Q: To your knowledge has the Schreier estate or trust ever paid any money to Hedeen Hughes & Wetering?
>
> A. Not to my knowledge, no.
>
> ***
>
> Q: [D]o you have any information that Mr. Wetering took some direct role in preparing the estate or trust tax returns?
>
> A: No, I don't think he did.

A. Schreier Dep. 250:13-20, 263:9-12; see also Wetering Aff. ¶ 6; Wetering Dep. 15:18-24.

17

To the extent Allan bases his legal malpractice claim on the rental rate issue, he also acknowledged that Wetering was not involved in negotiating or drafting the underlying leases or in otherwise setting the rental rate. A. Schreier Dep. 249:17- 50:6.

Because the record does not support a finding that HHW served as counsel for Allan, the estate, or the Trusts relating to the tax returns or the rental rates, Allan's claim for legal malpractice fails as a matter of law.

## III. Accounting Malpractice Claim

Allan also claims that Penning and DKH were professionally negligent in preparing the Trusts' tax returns. This issue again centers on application of the Q deduction. Allan argues that DKH should have claimed the Q deduction or, at a minimum, should have waited until the legislature passed the bill making the deduction applicable to John's estate returns.

Accountants are held to the same standard of reasonable care as lawyers, and a plaintiff in an accounting malpractice action must prove the same elements for a legal malpractice action. Vernon J. Rockler & Co. v. Glickman, Isenberg, Lurie & Co., 273 N.W.2d 647, 650 (Minn. 1978). An accounting malpractice claim is premised on a breach of the standard of care applicable to accountants, thereby requiring expert testimony to

establish a prima facie case. <u>Brown-Wilbert, Inc. v. Copeland</u>
<u>Buhl & Co.</u>, No. A05-340, 2005 WL 3111959, at *3 (Minn. Ct. App.
Nov. 22, 2005).

Allan relies on the testimony of his expert witness,
Christopher Wittich, to establish his accounting malpractice
claim. Wittich first asserts that DKH should have claimed the Q
deduction on John's estate tax return in February 2013. At issue
here is whether a Q deduction could be applied to land owned by a
trust. At the time Penning prepared John's estate tax return, the
law required that the "decedent continually owned the property for
the three-year period ending on the date of the death of the
decedent." Minn. Stat. § 291.03, subdiv. 10(3). According to
Wittich, the fact that John's Trust owned the property effectively
meant that John owned the property. <u>See</u> Kuipers Decl. Ex. 33, at
1-2 (opining that the ownership requirement "is met because
revocable trusts are ignored for tax purposes and the assets inside
of a revocable trust are treated as owned by the grantor of the
trust"). Thus, Wittich opines, Penning should have claimed the Q
deduction on John's estate return. But this opinion is
effectively rebutted by DKH's expert, Jeffrey Whitmore, and, more
notably undermined by the Minnesota legislature's subsequent
amendment to the law.

Whitmore persuasively explained why the Q deduction did not apply to John's estate return:

> Under Minn. Stat. § 291.03 Subd. 10(4) (2012), the law in force when John Schreier's estate tax return was filed, the M706Q election could be made only in a situation where "the decedent continuously owned the property for the three year period ending on the date of death of the decedent." In this situation, the property was owned by the John J. Schreier Revocable Intervivos Trust, not by the decedent John Schreier. Since the property was not titled in decedent's name for three years prior to the date of death, it would not meet the strict statutory requirements for making the M706Q election.

Second Kuipers Decl. Ex. 45, at 2; see also id. Ex. 46, at 2. When the legislature amended the law in May 2013, it expanded the definition of qualified farm property to include farmland "owned by a person or entity." Minn. Stat. § 291.03, subdiv. 10(2). As a result of the amendment, property owned by a trust rather than a decedent would qualify for the Q deduction, assuming all other requirements were met. See id.; see Second Kuipers Decl. Ex. 46, at 2.

The court is unpersuaded by Wittich's claim that the legislature simply amended the law in 2013 to clarify the statute's meaning, and that the amendment did not actually change the law. See Kuipers Decl. Ex. 33, at 1-2. His report ignores the statute's plain language, both pre- and post-amendment and includes no support for his opinion other than his belief. See Kuipers Decl.

20

Ex. 33.  He cites to no other cases in which the deduction was successfully claimed pre-amendment for trust-owned farmland, nor does he offer any other kind of evidence to bolster his baldly stated opinion.  See Wittich Dep. 30:9-33:24.  Wittich's opinion is further undermined by the Minnesota Department of Revenue's pre-amendment Estate Tax Fact Sheet explaining the Q deduction. See Kuipers Decl. Ex. 32.  The fact sheet notably does not say that a trust effectively qualifies as a "decedent" for purposes of the deduction.  See Kuipers Decl. Ex. 32, at 2.  Under these facts, the court concludes that the Q deduction did not apply to John's estate return and that Penning, therefore, was not professionally negligent in failing to claim the deduction.

The court also finds that Penning was not negligent in failing to wait to file the return until the amendment was enacted.  The portion of the amendment that affected John's estate return was not added to the proposed amendment until May 19, 2013, months after Penning filed the return.  See Kuipers Decl. Ex. 35, at 4. Even if Penning had been generally aware of proposed amendments to the law when she filed the return, the court will not subject her to liability for not anticipating changes that were months away from being considered.  Summary judgment is warranted on this claim.

## IV.  RICO Claim

Allan alleges that DKH and HHW conspired with Carl to defraud him in violation of RICO.   This claim is untimely and, in any event, meritless.

### A.   Limitations Period

Civil RICO carries a four-year statute of limitations. <u>Agency Holding Corp. v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 152 (1987).   Allan's RICO claim is therefore barred if the statute of limitations commenced before August 6, 2014 – four years before he added the RICO claim to this action.   The four-year statute of limitations for civil RICO claims does not begin to run until the plaintiff discovers or should have discovered his injury.   <u>Rotella v. Wood</u>, 528 U.S. 549, 554 (2000).  "[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."  <u>Id.</u> at 555.

The gravamen of Allan's RICO claim is that Carl and Michelle paid below market-rate rent for the farmland to  Barbara and, later, from the Trusts.   He has neither reasonably nor credibly argued that he was unaware of that issue or the damages he believes he incurred as a result until he added the RICO claim to this action on August 6, 2018.   Indeed, Allan began complaining about the rental rates as early as 2010 and it necessarily follows that

he understood the nature of any related damages.  Under these circumstances, the RICO claim is untimely by several years and must be dismissed on this basis alone.

**B.  Merits**

Even if timely, Allan's RICO claim is meritless.  Allan seems to allege that HHW and DKH conspired with Carl to keep the rental rates below market value so that Carl would be pleased with their services and continue to give them business.  Allan's theory is nonsensical and, in any event, unsupported by the facts

"RICO provides a private right of action for any person 'injured in his business or property by reason of a violation of' its substantive prohibitions." Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008) (quoting 18 U.S.C. § 1964(c)).  RICO, however, "does not cover all instances of wrongdoing," instead it "is concerned with eradicating organized, long-term, habitual criminal activity." Crest Const. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (citation and internal quotation marks omitted).  To state a RICO claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Id. (citation and internal quotation marks omitted).  It is important to note that RICO "does not cover all instances of wrongdoing[;] [r]ather, it is a unique cause of

action that is concerned with eradicating organized, long-term, habitual criminal activity." Id.

### 1. Enterprise

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. at 354 (quoting 18 U.S.C. § 1961(4)). To show a RICO enterprise, a plaintiff must show: "(1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering." United States v. Lee, 374 F.3d 637, 647 (8th Cir. 2004) (citation omitted). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other." Crest Const. II, 660 F.3d at 354 (citations and internal quotation marks omitted).

Allan has not established the existence of an enterprise. Although he alleges that HHW, DKH, and Carl conspired to maintain low rental rates to his detriment and that of the Trusts' other beneficiaries, he has failed to present evidence of such an enterprise. Indeed, Allan could not articulate any facts to

support a finding that a criminal enterprise, let alone any concerted activity between DKH and HHW, existed:

> Q: Do you have any understanding of any regular relationship between [HHW] and DKH CPAs?
>
> A: Do I have any information about DKH and HHW working together?
>
> Q: Yes.
>
> A: Only probably through the fact that they knew each other. They are both from Worthington. They might have worked together before. But I don't have a list of clients that they did mutual things together on, like, they had all of these different clients that worked together on. I think that they – I think we were assured that they knew each other because HHW ... is a longstanding firm in Worthington, and so is DKH. And you have to think this is a fairly small town that they had to cross paths once. I think we all know that.
>
> Q: So from time to time they would have mutual clients?
>
> A: I think so, yeah.

A. Schreier Dep. 262:15-63:8. In short, Allan assumes that DKH and HHW worked together, along with Carl, to his detriment simply based on their proximity to each other in a small town. Such an allegation shows no common purpose, no coordination or functioning as a unit, or any ascertainable structure.

### 2. Pattern of Racketeering Activity

An essential element of the civil RICO cause of action is proof that defendants have engaged in a "pattern of racketeering

activity." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985). "A pattern is shown through two or more related acts of racketeering activity that amount to or pose a threat of continued criminal activity." <u>Nitro Distrib., Inc. v. Alticor, Inc.</u>, 565 F.3d 417, 428 (8th Cir. 2009) (citations and internal quotation marks omitted). Only the criminal acts listed in 18 U.S.C. § 1961(1) constitute racketeering activity. <u>See</u> <u>Manion v. Freund</u>, 967 F.2d 1183, 1186 (8th Cir. 1992).

Allan bases his RICO claim on alleged mail and wire fraud. "When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." <u>H&Q Props., Inc. v. Doll</u>, 793 F.3d 852, 856 (8th Cir. 2015) (citations and quotation marks omitted). "[T]he term scheme to defraud connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud." <u>Id.</u> at 856-57 (alteration in original) (citations and quotation marks omitted).

Here, Allan has utterly failed to establish the required intent to defraud by either DKH or HHW. He again turns to the Q deduction as a basis for his belief that Penning intended to

somehow defraud him and the estate by failing to claim the deduction.  As already discussed, Penning's decision to not claim the deduction does not qualify as professional negligence, let alone fraud.  Moreover, Penning had nothing to gain through the fraud as Allan alleges.  Likewise, there is no evidence that HHW intended to defraud Allan or the Trusts through use of the mail, electronically, or otherwise.  Indeed, HHW was not retained to represent anyone relating to the events at issue.  The RICO claim fails as a matter of law.

## V.  Aiding and Abetting

Finally, Allan alleges that HHW and DKH aided and abetted Carl in breaching his fiduciary duties to the Trusts by somehow allowing him to secure below-market rental rates for the farmland. A claim for aiding and abetting the tortious conduct of another has three basic elements:

> (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff;
>
> (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach.

Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999) (citing Restatement (Second) Torts § 876(b); Ezzone v.

_Riccardi_, 525 N.W.2d 388, 398 (Iowa 1994)). Where, as here, the claim involves a professional-client relationship, courts rely on "strict interpretation of the elements of aiding and abetting to preclude meritless claims." _Id._ at 186-87.

Even generously assuming Allan could establish the first two elements of an aiding and abetting claim, he has not established that HHW or DKH played any role in establishing – through any assistance or encouragement - the rental rates at issue. The record shows that DKH provided nothing more than routine professional services, which, alone, are insufficient to establish substantial assistance in carrying out tortious activity. _See id._ at 189 ("If we were to recognize that such routine services constitute substantial assistance, then it would be the rare accountant indeed who would not be subject to automatic liability merely because his client happened to be a tortfeasor."). And, as noted, the record does not support any finding that HHW provided any professional services relevant to the circumstances at issue. As a result, summary judgment is also warranted on this claim.

**VI. Partial Summary Judgment Motion**

Allan's motion for partial summary judgment requests the following relief: (1) an order finding that Carl breached his fiduciary duties to the Trusts; (2) an order allowing Alan to have

28

an additional expert witness testify as to the market rents of the farmland involved in this case; and (3) an order declaring specific market rents for that farmland for 2011-2015. None of these requests is appropriate.

First, the question of whether Carl, who is not a party, breached his fiduciary duty is not at issue in this matter and will not be considered by the court. This case principally involves whether DKH and HHW breached their respective professional duties, the resolution of which does not depend on the propriety of Carl's conduct. Moreover, Allan has already released Carl from liability relating to the rental rates. Second, the court has already denied Allan's request for an additional witness several times. See ECF Nos. 38, 45, 58, 63. It will not revisit that determination again now and, frankly, finds Allan's request to be vexatious. Third, courts do not decide disputed facts on summary judgment. If the rental rates were materially at issue and disputed, a jury rather than the court would decide the matter.

Allan's motion highlights that this case is not really about DKH's and HHW's conduct, but rather Allan's desire to continue challenging his brother's past actions under the Trusts. Although family disputes are often grounded in complicated histories and

therefore difficult to resolve, the court is hopeful that the parties can put their differences aside and move forward peaceably.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.     Defendants' motions for summary judgment [ECF Nos. 76, 86] are granted;

2.     Plaintiff's motion for partial summary judgment [ECF No. 69] is denied; and

3.     The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 24, 2020

s/David S. Doty
David S. Doty, Judge
United States District Court
